United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 97-2437

_____

| | | |
|---|---|---|
| Larry Chandler, Joanne Chandler of | * | |
| Jefferson County, on behalf of | * | |
| themselves and all others similarly | * | |
| situated, | * | |
| | * | Appeal from the United States |
| Appellants, | * | District Court for the |
| | * | Eastern District of Missouri. |
| v. | * | |
| | * | |
| Norwest Bank Minnesota, National | * | |
| Association; Custom Mortgage, Inc., | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: December 10, 1997
Filed: March 3, 1998

_____

Before BOWMAN, FLOYD R. GIBSON, and LOKEN, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Joanne and Larry Chandler appeal from the grant of summary judgment entered by the District Court[1] in favor of Norwest Bank Minnesota, N.A. (Norwest) and Custom Mortgage, Inc. (Custom) on the Chandlers' claims under the Real Estate

_____

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 (1994) (RESPA).  The Chandlers also appeal the District Court's imposition of sanctions under Rule 11.  See Fed. R. Civ. P. 11.  We affirm.

## I.

On January 22, 1996, the Chandlers entered into a mortgage loan transaction with Custom to refinance their home.  The Chandlers gave Custom a deed of trust on their home as security for a loan in the total amount of $60,375.00, including a 2 percent "loan origination fee" (amounting to $1,207.50) and a 3 percent "loan discount fee" (amounting to $1,811.25) payable to Custom for its services in obtaining the loan. The parties do not dispute that the net loan proceeds ultimately disbursed to the Chandlers were $57,156.25.

In connection with the mortgage loan transaction, the Chandlers signed a document entitled "Notice of Assignment, Sale or Transfer of Servicing[2] Rights," informing the Chandlers that "the right to collect payments from you is being assigned, sold or transferred" effective January 22, 1996 from Custom to "Norwest Bank Minnesota, National Association as Trustee," and identifying the Chandlers' new mortgage servicer as LSI Financial Group.[3]  Appellants' App. at 14.  This notice does not refer in any way to the funding sources for the Chandlers' loan, nor does it refer to

---

[2]"Servicing" is defined under RESPA regulations as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any mortgage loan . . . and making the payments to the owner of the loan . . . of principal and interest and such other payments . . . as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract."  24 C.F.R. § 3500.2(b) (1997).

[3]RESPA requires that those making federally related mortgage loans "shall disclose" at the time application is made "whether the servicing of any such loan may be assigned, sold, or transferred," and, if the person making the loan does not engage in servicing, "that there is a present intent . . . to assign, sell, or transfer the servicing of such loan."  12 U.S.C. § 2605(a)(1) (1994); see also 24 C.F.R. § 3500.21.

the sale of the Chandlers' mortgage loan itself. Although this paperwork was completed on January 22, 1996, the Chandlers' loan did not close until January 26, 1996, after their option to cancel the transaction had expired. The Chandlers concede that the loan closed with Custom identified as the lender.

Custom obtained the capital necessary to fund the Chandlers' loan through its pre-existing line of credit with CoreStates Bank, and, pursuant to that credit arrangement, CoreStates transferred $57,156.25 to Custom's warehouse account on January 26, 1996. On that same day, Custom disbursed $57,156.25 to the Chandlers.

On January 31, 1996, Equicon Corporation, in accordance with a "Purchase and Sale Agreement" between Equicon, Norwest, and Custom, purchased the Chandlers' mortgage loan from Custom by depositing $57,156.25 into Custom's CoreStates bank account, whereupon Custom repaid its outstanding loan balance, plus interest, to CoreStates on the same day. Equicon purchased the Chandlers' mortgage loan for deposit into the Equicon Loan Purchase Trust established by Equicon to hold various assets, principally mortgages, that would ultimately secure certificates sold to investors. At the direction of Equicon, and pursuant to the parties' agreement, Custom assigned the Chandlers' loan to Norwest, as trustee of the Equicon Trust, for deposit into the trust. Norwest was appointed trustee of the Equicon Trust under a pooling and servicing agreement dated January 1, 1995 naming Equicon as the sponsor and LSI Financial Group as the servicer of the trust. Norwest's duty as trustee was to be the primary custodian of the mortgage loan documents Equicon purchased from Custom and other lenders.

Equicon subsequently sold the mortgages in the Equicon Trust, including the Chandlers' mortgage loan, to another trust, "Access Financial Lending Corporation Series 1996-3," and Norwest was also appointed trustee of this trust. In its role as trustee of the Access Trust, Norwest is responsible for holding the mortgage documents, ensuring that payments on the mortgages are properly channeled to the

investors pursuant to the trust documents, and providing reports to the investors. As trustee of both the Equicon Trust and the Access Trust, Norwest holds no beneficial ownership interest in any of the mortgage loans held in the trusts.

In April 1996, the Chandlers filed suit on behalf of themselves and two putative classes of other allegedly similarly situated residential mortgage loan customers claiming that Custom "sold" their loan to Norwest, rather than to Equicon, prior to closing, rather than after closing, and that their loan was "table funded" by Custom for Norwest.[4] The Chandlers essentially allege that Norwest, not Custom, was the actual source of funding for their mortgage loan. Consequently, they claim that Norwest, as the purported "owner" of the loan prior to closing, paid excessive and unearned fees to Custom, and that both Norwest and Custom acted in violation of Section 8 of RESPA, 12 U.S.C. § 2607.

The District Court granted Norwest's motion for summary judgment, finding that Norwest lacked any involvement in the Chandlers' loan transaction. Likewise, the court granted Custom's motion for summary judgment, finding that Custom did not table fund the Chandlers' mortgage loan and that the loan transaction was a bona fide "secondary market transaction" exempt from RESPA. See 24 C.F.R. § 3500.5(b)(7). In addition, the District Court imposed sanctions on the Chandlers' attorneys under Rule 11 for their failure to investigate the facts prior to filing the lawsuit. The Chandlers appeal the District Court's grant of summary judgment to Norwest and Custom, and the court's imposition of Rule 11 sanctions.

---

[4]Under RESPA, "table funding" means "a settlement at which a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds." 24 C.F.R. § 3500.2(b) (1997).

## II.

We review a grant of summary judgment de novo, using the same standard governing the district court's decision. See Stevens v. St. Louis Univ. Med. Ctr., 97 F.3d 268, 270 (8th Cir. 1996). "We will affirm the judgment if the record shows that there is no genuine issue of material fact and that the prevailing party is entitled to judgment as a matter of law." Brodnicki v. City of Omaha, 75 F.3d 1261, 1264 (8th Cir.), cert. denied, 117 S. Ct. 179 (1996) (citation omitted).

The Chandlers' claim rests on alleged violations by Norwest and Custom of RESPA. Consequently, the Chandlers must establish that their mortgage loan transaction is covered by the Act. If the transaction falls outside the coverage of RESPA, the Chandlers' claim necessarily fails.

Specifically, the Chandlers contend that Norwest and Custom table funded the Chandlers' mortgage loan thus bringing the transaction under the coverage of RESPA, and that Norwest thereafter violated Section 8 of the Act by paying Custom referral fees or unearned and excessive fees. Custom, according to the Chandlers, also violated Section 8 of RESPA by receiving the referral fees or excessive and unearned fees from Norwest. Norwest and Custom, on the other hand, claim that the Chandlers' mortgage loan was sold to Equicon pursuant to a transaction that is exempt from RESPA and that the Chandlers' claims fail as a matter of law.

RESPA and its accompanying regulations "apply to all federally related mortgage loans," 24 C.F.R. § 3500.5(a), including the Chandlers'. Section 8 of RESPA prohibits all kickback and referral fee arrangements whereby any payment is made or "thing of value" is furnished for the referral of real estate settlement services, 12 U.S.C. § 2607(a), and also prohibits a person that renders a settlement service from splitting with or rebating to any other person any portion of the charges associated with real estate settlement services except in return for services actually performed, see id.

§ 2607(b); see also Bloom v. Martin, 77 F.3d 318, 320 (9th Cir. 1996); Durr v. Intercounty Title Co. of Illinois, 14 F.3d 1183, 1186 (7th Cir.), cert. denied, 513 U.S. 811 (1994); Mercado v. Calumet Fed. Sav. & Loan Ass'n, 763 F.2d 269, 271 (7th Cir. 1985). Section 8 specifically permits, however, "the payment to any person of a bona fide salary or compensation or other payment for . . . services actually performed." 12 U.S.C. § 2607(c)(2).

The regulations under RESPA, Regulation X, exempt from the provisions of Section 8 those fees and charges paid in connection with legitimate secondary market transactions involving a "bona fide transfer of a loan obligation in the secondary market" taking into consideration "the real source of funding and the real interest of the funding lender."  24 C.F.R. § 3500.5(b)(7).  Regulation X excludes table funded transactions from the scope of a legitimate secondary market transaction, thus, table funded transactions are covered by Section 8 of RESPA. See id.  In order to prevail, the Chandlers must present some evidence that their loan was table funded--that the loan was funded at settlement by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds. See id. § 3500.2(b).

We agree with the District Court that the Chandlers have failed to produce any evidence that the $57,156.25 disbursed to them on January 26, 1996 in connection with their mortgage loan came from any source other than Custom.  The documentation prepared by the parties to the transaction indicates that Custom obtained the capital necessary to fund the Chandlers' mortgage loan exclusively through its credit arrangement with CoreStates.[5]  Furthermore, the evidence establishes that Custom repaid its CoreStates loan, with interest, on January 31, 1996.  Contrary to the Chandlers' assertions, their mortgage loan was not table funded by Norwest--their loan

---

[5]The Chandlers have neither alleged nor shown any affiliation between CoreStates and Norwest.

was not funded by an advance of loan funds to Custom by Norwest coupled with a contemporaneous assignment of the loan by Custom to Norwest.

The Chandlers point to the existence of the Purchase and Sale Agreement between Custom, Equicon, and Norwest as evidence to support their allegation that Norwest, as trustee of the Equicon Trust, was somehow the source of funding for the Chandlers' mortgage loan. This argument is without merit. The uncontroverted evidence confirms that Custom closed the loan in its own name with funds borrowed from CoreStates under an established line of credit. Three days later, the loan was sold by Custom to Equicon, not Norwest. Equicon transferred by wire the funds necessary to purchase the Chandlers' loan to Custom's CoreStates account, and Custom thereafter repaid its outstanding loan balance to CoreStates. The Purchase and Sale Agreement cannot and does not raise a material question of fact necessary to defeat a summary judgment motion. The District Court did not err in granting summary judgment to Norwest and Custom.

## III.

We next turn to the District Court's decision to impose Rule 11 sanctions against the Chandlers' counsel. Rule 11 requires all parties who file a complaint in federal court to ensure "that to the best of the person's knowledge . . . formed after an inquiry reasonable under the circumstances, . . . the claims . . . are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law" and that the "allegations and other factual contentions have evidentiary support." Fed. R. Civ. Proc. 11. The rule allows a district court to impose an "appropriate sanction" when a party files a complaint in derogation of this responsibility. Id. We review a court's decision to impose Rule 11 sanctions for abuse of discretion. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990); Landscape Properties, Inc. v. Whisenhunt, 127 F.3d 678, 682 (8th Cir. 1997).

The District Court determined that, while the Chandlers arguably may have had a reasonable belief that their claim against Custom had or was likely to have evidentiary support, their counsel could not have conducted the inquiry necessary to support the Chandlers' claim against Norwest. We agree with the District Court that the Chandlers failed to produce even a scintilla of evidence that Norwest was involved in their mortgage loan transaction in any capacity other than as trustee of the Equicon Trust, or that Custom table funded for Norwest their mortgage loan as defined under Regulation X, or that Norwest paid improper referral fees or unearned and excessive fees to Custom in violation of Section 8 of RESPA. In these circumstances, the District Court did not abuse its discretion by imposing sanctions under Rule 11.

## IV.

For the foregoing reasons, we affirm the District Court's grant of summary judgment to Norwest and Custom and the court's imposition of Rule 11 sanctions against the Chandlers' counsel.

FLOYD R. GIBSON, Circuit Judge, dissenting:

I respectfully dissent. The Real Estate Settlement Procedures Act ("RESPA") was enacted "to insure that consumers throughout the Nation . . . are protected from unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. § 2601 (1994). To facilitate this purpose, RESPA prohibits kickbacks and unearned fees:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a) (1994). While secondary market transactions are exempted from RESPA's coverage, see 24 C.F.R. § 3500.5(b)(7) (1997), I believe the Chandlers presented a genuine issue of material fact as to whether the arrangement designed by Custom, Norwest, and Equicon was a bona fide secondary market transaction. Therefore, I would reverse the district court's judgment.

The regulations under RESPA provide that "[a] bona fide transfer of a loan obligation in the secondary market is not covered by RESPA." Id. The regulation further provides that "[i]n determining what constitutes a bona fide transfer, HUD will consider the real source of funding and the real interest of the funding lender." Id. Custom was able to show that the funds it borrowed for the Chandlers' loan came from its direct line of credit with CoreStates. However, Custom had previously entered into a Purchase and Sale Agreement with Equicon and Norwest, under which Equicon would purchase loans from Custom to be held in trust with Norwest as the Trustee. Custom and Equicon had already agreed that Equicon would transfer funds to Custom's CoreStates account to cover the loan amount shortly after the Chandlers' loan closed. In fact, Custom and Equicon notified CoreStates of the planned funds transfer on January 3, 1996, three weeks before Custom provided the Chandlers with the loan amount. Therefore, even though Custom borrowed $57,156.25 against its line of credit with CoreStates, Custom knew that "[Equicon], on behalf of [Norwest]," Appellant's App. at 16, would deposit that amount shortly afterwards. In fact, for Custom's part in the deal, it received $3,018.75 from the Chandlers in loan origination and discount fees, as well as $7,160.43 from Equicon, on behalf of Norwest which included (1) the $3,018.75 loan origination and discount fees; (2) interest on Custom's loan from CoreStates; and (3) $3,881.27 in yield spread points.

A bona fide secondary market transaction is one where a mortgage lender makes loans for its own portfolio and finances these loans from its own or borrowed funds and holds the loans for varying periods of time, or until maturity, with the option of selling its loans, usually in batches on the open market, and not in a preordained procedure

where a party makes a loan knowing it will be transferred in due course in a matter of days to the ultimate lender. It appears to me that the transaction involved in this case is a pure circumvention of the Congressional legislation relating to federally related mortgage financing and marketing.

Based on the structure of the overall transaction, I believe that the "real source of funding" for the Chandlers' loan was Equicon, acting on behalf of Norwest.[6] In my view, the Chandlers presented a genuine issue of material fact as to whether Norwest gave and Custom accepted a fee based on Custom's servicing of the Chandlers' loan in violation of RESPA. See 12 U.S.C. § 2607(a). After viewing the facts in the light most favorable to the Chandlers, see Reich v. ConAgra, Inc., 987 F.2d 1357, 1359 (8th Cir. 1993), the facts show that Custom and Norwest engaged in a sham transaction which was purposely designed to avoid coverage under RESPA. I do not believe Congress authorized this type of transaction; nor do I believe that this type of transaction is deserving of our judicial stamp of approval. Therefore, I would reverse the district court's summary judgment in favor of Norwest. Accordingly, I would also reverse the district court's imposition of Rule 11 sanctions on the Chandlers' attorney.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[6]A table funded loan is one in which "a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds." 24 C.F.R. § 3500.2 (1997). The right to service the Chandlers' loan and to collect payments was assigned to Norwest on January 22, 1996. While the loan funds had not been deposited into Custom's CoreStates account at the time of closing, the parties had already agreed that such a transfer would occur. In fact, the record evidence established that Equicon deposited a total of $64,316.68 into Custom's CoreStates account just five days after the loan closed.