**John BRANCHEAU and Blanca Brancheau, Plaintiffs,**

v.

**RESIDENTIAL MORTGAGE and Mercantile Bank of St. Louis, Defendants.**

**No. Civ. 97–53(JRT/RLE).**

United States District Court,
D. Minnesota.

Sept. 4, 1998.

William Harvey Crowder, Susan Ford Bedor, Vildan A. Teske, Crowder & Bedor, St Paul, MN, Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Richard J. Doherty, Tara L. Goodwin, Edelman & Combs, Chicago, IL, for plaintiffs.

Edward Michael Laine, Oppenheimer, Wolff & Donnelly, St. Paul, MN, Christopher

Cain, Oppenheimer, Wolff & Donnelly, Mpls, MN, Mark G. Arnold, Husch & Eppenberger, St Louis, MO, Brian Neal Johnson, Halleland, Lewis, Nilan, Sipkins & Johnson, Mpls, MN, for Residential Mortgage.

Mark G. Arnold, Husch & Eppenberger, St Louis, MO, Brian Neal Johnson, Halleland, Lewis, Nilan, Sipkins & Johnson, Mpls, MN, for Mercantile Bank of St. Louis, N.A.

## MEMORANDUM OPINION AND ORDER

TUNHEIM, District Judge.

Plaintiffs John and Blanca Brancheau commenced this purported class action against Residential Mortgage Group, Inc. ("Residential") and Mercantile Bank of St. Louis, N.A. ("Mercantile") under the Real Estate Settlement Procedures Act (RESPA). Plaintiffs contend that the yield spread premium Mercantile paid to Residential in exchange for plaintiffs' mortgage loan violated RESPA's prohibitions against kickbacks and fee splitting. Plaintiffs also assert state common law claims against Mercantile.

This matter is before the Court on separate motions for summary judgment by Mercantile, Residential, and plaintiffs. Also pending is plaintiffs' motion for class certification. For the reasons that follow, the motions for summary judgment by Residential and plaintiffs are denied. Mercantile's motion for summary judgment is granted in part and denied in part, and plaintiffs' motion for class certification is granted.

## FACTS

Plaintiffs began looking for homes in Minnesota in February 1996. Plaintiffs went to Residential to arrange financing. Residential is a mortgage loan broker with its principal place of business in St. Louis Park, Minnesota. At the time of this transaction, Residential had relationships with 15–20 lenders, including Mercantile.

Plaintiff John Brancheau met with Peter Ruliffson of Residential on or around March 5, 1996. At that time, they discussed the financial information Residential needed to obtain a loan for plaintiffs. Brancheau claims Ruliffson assured him that he would get the best interest rate available, an allegation Ruliffson denies.

The following day, plaintiffs entered into a purchase agreement for a home in Savage, Minnesota. On March 15, 1996, plaintiffs submitted an application for a mortgage loan to Residential. Plaintiffs received a loan in the amount of $122,800 and locked into an interest rate of 7.25%. Plaintiffs' loan was a "7/23 balloon"—a loan amortized over a 30 year period but payable in full after seven years.

The price of a home mortgage loan is a function of the interest rate and the points paid up front. The higher the points, the lower the interest rate, and vice versa. In March 1996, when plaintiffs locked in their loan, most brokers were offering 7/23 loans for 7.5%. At 7.25%, plaintiffs' loan had a lower interest rate. Plaintiffs claim Residential never informed them that they could pay a fee up front and obtain a lower interest rate.

After plaintiffs locked in the interest rate, Residential looked for a lender to finance the loan. Reliastar offered to pay 99.125% of the face amount of the loan in exchange for the loan, plus 1.25% of the face amount of the loan for the right to service the loan. In the mortgage industry, 100% of the face amount of a loan is referred to as "par." In total, Reliastar offered to pay Residential .375% over par.

Mercantile offered to pay .625% over par. This price is listed in Mercantile's March 15, 1996 rate sheet. Like other lenders, Mercantile issues a daily rate sheet indicating the price it will pay for various loans on various terms. The price Mercantile will pay increases as the interest rate increases.[1] How-

---

1. For example, the March 15, 1996 rate sheet reflects the following prices for 7/23 balloon mortgages:

| Rate | 30 Day | 60 Day |
|---|---|---|
| 6.875% | 99.750 | 99.500 |
| 7.000% | 100.125 | 99.875 |
| 7.125% | 100.500 | 100.250 |
| 7.250% | 100.875 | 100.625 |
| 7.375% | 101.250 | 101.000 |
| 7.500% | 101.625 | 101.375 |
| 7.625% | 101.875 | 101.625 |
| 7.750% | 102.250 | 102.000 |

ever, the services Residential performs do not vary, regardless of the interest rate.

Although it is not listed on the rate sheet, Mercantile calculated the price it was willing to pay for a loan like plaintiffs' based on the "net asset value" of the loan and the "loan servicing value." The net asset value is the gross value of the loan minus the cost to Mercantile of acquiring it. In this case, Mercantile calculated the net asset value at 99.875% of the face amount of the loan.

The loan servicing value reflects the value to Mercantile of the right to service the loan. Although Mercantile resells many of the loans it acquires, it often retains the servicing rights, and receives compensation for servicing the loans. In this case, Mercantile assessed the value of the servicing rights at .75% of the face value of the loan. The total of the two values is .625% over par.

Residential selected Mercantile as lender because Mercantile was willing to pay more than Reliastar. When a lender like Mercantile pays a mortgage broker more than the par value of the loan, the excess is often called a yield spread premium. In plaintiffs' loan transaction, the yield spread premium was .625% of the face amount of the loan, or $767.50. Since Residential had already committed to make the loan, Residential's choice of lender did not impact the economic terms of plaintiffs' loan.

The closing on plaintiffs' home occurred on May 10, 1996. At the closing, Residential funded plaintiffs' loan with Mercantile's money, and immediately assigned the loan to Mercantile. In the mortgage industry, this practice is known as "table-funding."[2]

A Loan Correspondent Agreement establishes the terms under which Residential will assign loans to Mercantile, and Mercantile will purchase them from Residential. The Agreement establishes that Residential is compensated for its services by borrowers. The Agreement provides:

[Residential's] compensation for performing under this Agreement shall:

a. Be paid for by the applicant.

b. Be disclosed, agreed to, and signed by the applicant in writing at the time of the application. . . .

At the closing, Residential received compensation from plaintiffs and Mercantile. Plaintiffs paid a 1% origination fee of $1,228. Residential also received the $767.50 yield spread premium, for a total of $1,995.50. Residential's overhead cost per loan is approximately $2,500. Since the $1,995.50 Residential received is less than $2,500, Residential contends it lost money on the transaction.

## ANALYSIS

### I. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. It states, in pertinent part:

[Summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Initially, the movant bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the evidence offered by the non-moving party is to be believed and all justifiable inferences therefrom are to be drawn in the light most favorable to that party. *See Matsushita Elec. Indus. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348,

| 7.875% | 102.500 | 102.250 |

**2.** Residential also provides funding on a "closed loan" basis. In closed loan transactions, Residential funds the loan and is reimbursed from the lender.

89 L.Ed.2d 538 (1986). Where a moving party makes and supports a motion for summary judgment, the party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. 2505; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995). If a genuine issue of material fact exists, the court is obligated to deny cross motions for summary judgment. *Jacobson v. Maryland Cas. Co.*, 336 F.2d 72, 75 (8th Cir.1964); *Sherwood v. Washington Post*, 871 F.2d 1144, 1147 n. 4 (D.C.Cir.1989).

## II. RESPA Claims

RESPA applies to all "federally related mortgage loans." 24 C.F.R. § 3500.5(a); *see also Chandler v. Norwest Bank Minnesota, Nat'l Ass'n*, 137 F.3d 1053 (8th Cir.1998), *petition for cert. filed* (July 23, 1998). The purpose of RESPA is to protect home buyers from "unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. § 2601(a).

In Count I of the complaint, plaintiffs contend that the yield spread premium violated RESPA's prohibition against kickbacks and referral fees (12 U.S.C. § 2607(a)). In Count II, plaintiffs contend the yield spread premium violated RESPA's prohibition against splitting charges (12 U.S.C. § 2607(b)). The Court will consider each claim in turn.

### A. Count I—RESPA § 2607(a)

Section 2607(a) of RESPA prohibits providers of real estate settlement services from paying kickbacks or referral fees. Section 2607(a) provides:

> (a) **Business referrals.** No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service

involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a).[3]

■ A referral exists if: 1) a thing of value is paid; 2) the payment is made pursuant to an agreement to refer settlement business; and 3) settlement business is actually referred. *Culpepper v. Inland Mortgage Corp.*, 132 F.3d 692, 695–96 (11th Cir.), *as modified*, 144 F.3d 717 (1998).

■ The yield spread premium meets this three-part test. The yield spread premium is a thing of value; Residential chose to refer plaintiffs' loan to Mercantile based on the amount of the yield spread premium; and Mercantile actually received settlement business as a result of the payment. Thus, the yield spread premium is a referral fee under § 2607(a).

Section 2607(a) is limited by § 2607(c), which provides in pertinent part:

> (c) **Fees, salaries, compensation, or other payments.** Nothing in this section shall be construed as prohibiting ... (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed....

12 U.S.C. § 2607(c).

An analysis under subsection (c) involves two steps. In the first step, the Court must determine whether the payment was made in exchange for "goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c). If the payment was for goods or services, the HUD regulations establish a test for assessing whether the amount of the payment is so excessive that a portion of the payment should be considered an improper referral fee. 24 C.F.R. § 3500.14(g)(2); *see also Culpepper*, 132 F.3d at 697. This is the second step of the inquiry. Under this step, a fee that bears "no reasonable relationship to the market value of the goods or services provided" is not considered compensation for goods or services. 24 C.F.R. § 3500.14(g)(2). A payment that satisfies both inquiries is protected

---

**3.** Originating, handling and closing a loan are "settlement services" under RESPA. 12 U.S.C. § 2602(3).

under § 2607(c). However, if either inquiry fails, the payment violates RESPA's prohibition against kickbacks and referral fees.

Thus, the Court begins its analysis with an assessment of whether the yield spread premium Mercantile paid to Residential was compensation for "goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c). For the reasons that follow, the Court holds that the yield spread premium does not represent payment for "goods or facilities actually furnished," and that a genuine issue of material fact exists concerning whether the yield spread premium was compensation for "services actually performed."

### 1. "Goods or facilities actually furnished"

■ Defendants contend the yield spread premium compensated Residential for a valuable asset, and therefore qualifies as a "good" under subsection (c). Mercantile plainly received something of value from Residential. Residential could have directed plaintiffs' loan to one of 15–20 lenders, but chose to direct it to Mercantile. Mercantile received valuable business as a result of that choice. Consequently, the Court agrees that Mercantile received a valuable asset from Residential.

However, subsection (c) does not protect "assets;" it protects "bona fide compensation ... for goods or facilities actually furnished." 12 U.S.C. § 2607(c). "Goods" and "facilities" are terms that generally refer to tangible items. See, e.g., U.C.C. § 2–105 (defining "goods" as things that are movable at the time of identification to the contract); Webster's Third New International Dictionary 978 (3d ed.1993) (defining "good" as "tangible movable personal property having intrinsic value usually excluding money and other

choses in action ..."); Id. (defining "facility" as "something ... that is built, constructed, installed, or established to perform some particular function ..."); but see Hastings v. Fidelity Mortgage Decisions Corp., 984 F.Supp. 600, 612 n. 13 (N.D.Ill.1997) (holding that loans are "goods" within RESPA § 2607(c)). Moreover, Congress used the broader term "thing of value" in subsection (a) to describe the kinds of payments that constitute illegal referral fees. See 12 U.S.C. § 2607(a). If Congress had intended that subsection (c) cover "things of value," it could easily have employed the same language in that subsection. However, because Congress used the words "goods" and "facilities," Congress must have intended to exclude intangible items, such as the asset Mercantile received.

For these reasons, the yield spread premium does not represent payment for goods or facilities actually furnished.[4]

### 2. "Services actually performed"

■ Subsection (c) also exempts "bona fide ... compensation ... for services actually performed." 12 U.S.C. § 2607(c)(2). A genuine dispute of material fact exists concerning whether the yield spread premium was bona fide compensation for services.

Mercantile and Residential have presented evidence that the yield spread premium was compensation for Residential's services. First, Residential performed services for plaintiffs and Mercantile by, among other things, collecting financial information and documents, completing a loan application, ordering appraisals of the property, and participating in the closing. It is common in the mortgage industry for the lender and borrower to pay a portion of the broker's fees for these services. Second, both defendants viewed the $767.50 yield spread premium as

---

4. Plaintiffs contend that Residential did not have an asset to sell to Mercantile because the transaction was table-funded. Plaintiffs rely on *Culpepper v. Inland Mortgage Corp.*, 132 F.3d 692 (11th Cir.1998), for this proposition. The Court rejects plaintiffs' argument. The fact that the transaction was table-funded means that the lender funded the loan at the closing, and was the owner of the loan from the outset. Although Residential never owned the loan, Residential

had a valuable asset to direct to Mercantile or another lender. The asset consisted of future business, and Residential was able to direct that asset to the lender of its choosing. Accordingly, Residential owned a thing of value. Although the Court holds that the asset does not fit within the language of subsection (c), this holding is not based on the fact that the transaction was table-funded.

compensation for Residential's work. Finally, defendants have presented evidence that yield spread premiums can be a beneficial way for borrowers to finance the cost of brokerage fees. By paying a higher interest rate, borrowers can lower the amount of cash required up front. The result of this sort of arrangement is that the lender pays all or a portion of the brokerage fees for the borrower, and the borrower pays the lender over time via a slightly higher interest rate.

Viewing this evidence in the light most favorable to defendants, the fact-finder could conclude that the yield spread premium compensated Residential for its services, thereby reducing the amount of the brokerage fee plaintiffs paid Residential.

However, the finder of fact could reach the opposite conclusion based on the evidence plaintiffs presented. Plaintiffs have presented evidence that the amount of the yield spread premium depends solely on the interest rate of the loan. Thus, although the level of service Residential provides does not change, the yield spread premium increases as the interest rate increases. These facts suggest that the yield spread premium does not compensate Residential for its work.

The manner that Mercantile determined the amount of the yield spread premium also supports this conclusion. Mercantile determined the amount of the yield spread premium based on the net asset value of the loan and the value of the servicing rights—not the value of Residential's services.

Lastly, the Loan Correspondent Agreement states that Residential is to be compensated by its customers, not Mercantile. In the Agreement, Mercantile disavowed any obligation to compensate Residential for its services. The Agreement states that Residential's compensation shall be "paid for by the applicant." The Agreement further provides:

> [Residential], at its own expense, shall furnish to [Mercantile] all credit data, financial statements, real estate information, and such additional items as [Mercantile], from time to time may require. In addition, [Residential], at its own expense, shall perform such other functions as [Mercantile] may require to close, fund, and complete the loan transaction.

Finally, Residential and Mercantile agreed that the terms of the Loan Correspondent Agreement would apply to all loan transactions regardless of their subsequent conduct:

> Each loan shall be subject to all representations and warranties specified in this Agreement, irrespective of the provisions of any other documents or conduct of the parties with respect thereto, and this Agreement shall exclusively govern the rights of the parties hereto despite the fact that the loans purchased will be subsequent to the date of this Agreement.

Given this evidence, a reasonable fact-finder could conclude that the yield spread premium was not payment for services. *Accord Culpepper v. Inland Mortgage Corp.*, 132 F.3d 692 (11th Cir.), *as modified,* 144 F.3d 717 (1998) (finding genuine issues of material fact in a factually similar transaction); *Dubose v. First Sec. Sav. Bank,* 974 F.Supp. 1426, 1432 (M.D.Ala.1997) (holding that material issues of fact prevent summary judgment as to legality of yield spread premium under § 2607(a)).

Defendants argue that the yield spread premium was legal because the total compensation Residential received was reasonable. Defendants also contend the yield spread premium was legal because it was determined by impartial market forces. Defendants are correct that no genuine issue of material fact exists concerning the reasonableness of the total fee Residential received. Residential presented evidence that it lost money on plaintiffs' transaction, and plaintiffs have not disputed this evidence. Defendants are also correct in asserting that the yield spread premium is based on market factors. The amount of compensation Residential received in this transaction was the result of arm's length transactions between plaintiffs and Residential and Mercantile and Residential.

Although defendants are correct in these assertions, they are not entitled to summary judgment. The problem with defendants' arguments is their failure to address the first step of the inquiry under subsection (c). Before assessing the reasonableness of the fee,

the Court must determine that the yield spread premium represents a payment for either goods or services. Defendants arguments become relevant only if the finder of fact concludes that the yield spread premium represented bona fide compensation for services.[5]

For these reasons, the parties' motions for summary judgment are denied as to Count I of the Complaint.

## B. Count II—RESPA § 2607(b)

In Count II, plaintiffs contend that defendants violated section 2607(b) of RESPA and its prohibition on splitting fees. Section 2607(b) states:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. § 2607(b). As the HUD regulations explain, this section prevents the payment of fees for nominal or non-existent services:

> A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this Part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

24 C.F.R. § 3500.14(c). Like subsection (a), subsection (b) is limited by the exception established in subsection (c) for "bona fide ... compensation ... for services actually performed." 12 U.S.C. § 2607(c).

For the same reasons outlined above, genuine issues of material fact prevent summary

judgment on this claim. A reasonable finder of fact could conclude that the yield spread premium was or was not compensation for services. Consequently, the cross motions for summary judgment on Count II are denied.

## III. Common Law Claims

Counts III and IV of the Complaint are directed at Mercantile. In Count III, plaintiffs allege that Mercantile intentionally interfered with their contract with Residential. In Count IV, plaintiffs allege that Mercantile induced Residential to breach its fiduciary duty to plaintiffs. For the reasons that follow, Mercantile is entitled to summary judgment on these claims.

### A. Count III—Intentional Interference with Contractual Relations

Plaintiffs must prove five elements to succeed on their tortious interference claim under Minnesota law: 1) a contract; 2) that Mercantile knew of the contract; 3) that Mercantile intentionally interfered with the contract; 4) that the interference was unjustified; and 5) that the interference damaged plaintiffs. *See Sip–Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 832 (8th Cir.1996).

Here, the contract is Residential's alleged promise to provide plaintiffs with the best interest rate available. Plaintiffs claim Mercantile induced Residential to breach the contract by offering plaintiffs a loan at a higher interest rate than they might otherwise have obtained.

Mercantile is entitled to summary judgment on this claim for at least two reasons. First, plaintiffs have not presented any evidence that Mercantile was aware of the alleged contract. Second, plaintiffs failed to present evidence that Mercantile interfered with the contract. Plaintiffs locked into a 7.25% interest rate before Residential select-

---

5. Undergirding defendants' arguments is the assertion that, as a policy matter, yield spread premiums should not run afoul of RESPA, due to the potential benefit and added flexibility they create for some consumers. The Court does not suggest that defendants are incorrect in this assertion, or that yield spread premiums are *per se* illegal. However, the Court is constrained to apply the plain language of RESPA, which plainly exempts only bona fide compensation for goods or services actually performed. The Court cannot ignore the statutory language and proceed directly to an analysis of the reasonableness of the broker's overall fee, as defendants advocate.

ed Mercantile to be the lender. The terms of the transaction between Residential and Mercantile had no effect on the economic terms of plaintiffs loan. Thus, the fact that Mercantile was willing to pay more for the loan than Reliastar did not hinder performance of plaintiffs' contract with Residential.

For these reasons, the Court grants Mercantile's motion for summary judgment and denies plaintiffs' cross motion for summary judgment on Count III of the Complaint.

## B. Count IV—Inducing a Breach of Fiduciary Duty

In Count IV, plaintiffs contend Mercantile induced Residential to breach its fiduciary obligations.

■ Most states recognize a cause of action for "aiding and abetting" a breach of fiduciary duty or "inducing a breach of fiduciary duty." *See AmeriFirst Bank v. Bomar*, 757 F.Supp. 1365, 1380 (S.D.Fla.1991) ("the majority of case law ... recognizes a cause of action for aiding and abetting common law torts, such as breach of fiduciary duty"); *see also S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847–48 (2d Cir.1987) (reciting elements of inducement of breach of fiduciary duty under New York law); *Hastings v. Fidelity Mortgage Decisions Corp.*, 984 F.Supp. 600, 614 (N.D.Ill.1997) (denying motion to dismiss borrower's claim of inducing breach of fiduciary duty against lender under Illinois law). The elements of a claim for inducing a breach of fiduciary duty are: 1) breach of duty by a fiduciary; 2) knowing inducement of or participation in the breach by the defendant; and 3) damages. *S & K Sales*, 816 F.2d at 847–48.

■ The Minnesota Supreme Court has not considered whether a claim for inducing a breach of fiduciary duty exists under Minnesota law. It is also unclear whether Residential owed a fiduciary duty to plaintiffs.[6] However, even if the Minnesota Supreme Court would recognize the cause of action *and* a fiduciary relationship existed between Residential and plaintiffs, plaintiffs' claim would fail. First, plaintiffs have not presented evidence that Mercantile had any knowledge of the conduct between Residential and plaintiffs. Second, plaintiffs have not demonstrated that they suffered damages as a result of the alleged breach of fiduciary duty. Plaintiffs contend they might have gotten a loan at a lower interest rate without the inducement of a yield spread premium. However, plaintiffs would have had to pay more at closing in exchange for a lower rate. Plaintiffs have not shown that the economic terms of a loan transaction without a yield spread premium would have been more advantageous than the actual loan transaction.

For these reasons, plaintiffs' claim for inducing a breach of fiduciary duty fails. The Court grants Mercantile's motion on this claim, and denies plaintiffs' cross motion.

## IV. Plaintiffs' Motion for Class Certification

Plaintiffs move to certify a class of persons who:

a. Entered into a residential mortgage transaction that was documented as a transaction under RESPA, in that a HUD–1 Settlement Statement was provided;

b. Paid Residential a loan origination and/or broker fee;

---

6. The relationship between an agent and principal is fiduciary in nature. *See Church of the Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1, 5–6 (Minn.1992). Plaintiffs contend that a fiduciary relationship exists between all mortgage brokers and borrowers. The Court disagrees. Whether a fiduciary relationship exists between a mortgage broker and a borrower depends on their conduct. *See Armstrong v. Republic Realty Mortgage Corp.*, 631 F.2d 1344, 1348 (8th Cir.1980) (holding that the conduct of the parties was "decisive" in determining whether a mortgage broker was in fiduciary relationship with the borrower under Missouri law); *Church of the Nativity*, 491 N.W.2d at 5–6 (agency relationship results from "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."). Plaintiffs contend that Residential promised to obtain the best interest rate possible. Because plaintiffs' claim fails in any event, the Court need not decide whether this allegation is sufficient to create a jury issue concerning the existence of an agency relationship.

c. The loan was originated in the name of Residential, but funded by Mercantile and assigned to Mercantile within two weeks of closing; and

d. The HUD–1 Settlement Statement shows that a "yield spread premium," "yield spread differential," "par-plus premium," "service release premium," or the like was paid to Residential.

 To certify a class, the Court must find that the case satisfies each requirement of Rule 23(a), and at least one of the requirements of Rule 23(b). The Court must undertake a "rigorous analysis" to assure that these requirements are met. *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The plaintiffs bear the burden of establishing that class certification is appropriate. *Id.* at 157, 102 S.Ct. 2364.

### A. Rule 23(a)

To satisfy Rule 23(a), plaintiffs must demonstrate that: the class is so numerous that joinder of all members is impracticable ("numerosity"); there are questions of law or fact common to the class ("commonality"); the claims or defenses of the named plaintiffs are typical of the claims or defenses of the class ("typicality"); and the named plaintiffs and their counsel will fairly and adequately protect the interests of the class ("adequacy"). Fed.R.Civ.P. 23(a). For the reasons that follow, the Court holds that the Rule 23(a) requirements are met.

#### 1. Numerosity

 Plaintiffs contend that the class consists of approximately 500 people. Neither defendant challenges plaintiffs' showing on this requirement, and the Court holds that the class is sufficiently numerous that joinder of all members is impracticable.

#### 2. Commonality

To demonstrate commonality, plaintiffs must show that there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). In *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), the Supreme Court observed that the commonality requirement is subsumed in the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over individual questions. *Id.* at 2243. Because plaintiffs seek certification under Rule 23(b)(3), the Court will consider this requirement in connection with the predominance requirement.

#### 3. Typicality

 A class will not be certified unless "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Typicality is satisfied "when the claims of the named plaintiffs emanate from the same event or are based on the same legal theory as the claims of the class members." *In re Potash Antitrust Litigation,* 159 F.R.D. 682, 693 (D.Minn.1995) (citing *In re Workers' Compensation,* 130 F.R.D. 99, 105 (D.Minn. 1990)). A "strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." *Id.*

 The named plaintiffs' RESPA claims are premised upon the same factual and legal theories as those of the purported class. They are accordingly typical of the claims of other class members.

#### 4. Adequacy

 There are no significant issues raised regarding the adequacy of representation. The named plaintiffs do not have interests antagonistic to those of the class, they have participated in pretrial discovery, and they have retained attorneys experienced in class action litigation.

For these reasons, the elements of Rule 23(a) are satisfied.

### B. Rule 23(b)(3)

Plaintiffs seek certification under Rule 23(b)(3). To allow plaintiffs to proceed under Rule 23(b)(3), the Court must find that common questions predominate over individual questions, and that a class action is superior to other methods of resolving plaintiffs' claims. Fed.R.Civ.P. 23(b)(3).

## 1. Predominance

 The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at ——, 117 S.Ct. at 2249. A claim meets the predominance requirement if "there exists generalized evidence which proves or disproves an element on a simultaneous, classwide basis, since such proof obviates the need to examine each class member's individual position." *Potash*, 159 F.R.D. at 693.

 Plaintiffs will use generalized evidence in attempt to demonstrate that the yield spread premiums Mercantile paid Residential did not compensate Residential for its services. The generalized proof consists of Mercantile's daily rate sheets, its method of calculating the amount of the yield spread premium, and the Loan Correspondent Agreement. This evidence supports each class member's RESPA claim against Residential and Mercantile.

Defendants argue that the legality of the yield spread premium presents issues that are inherently individual. In particular, defendants assert that the reasonableness of a broker's fee depends upon individual factors, such as the level and quality of service, and the amount of the fee. The Court does not disagree with this assertion. An inquiry into the reasonableness of the fee necessarily depends on the particular facts of each loan transaction. The problem with defendants' argument is the failure to distinguish between the two-pronged inquiry this Court must undertake in assessing the exception for "services actually performed." The reasonableness analysis only becomes necessary if it is established that the yield spread premium was compensation for services. It is this prong of the inquiry that is at issue in this case, and which meets the predominance requirement.[7]

The Court's holding is consistent with *Mulligan v. Choice Mortgage Corp., USA*, No. 96–596–B, slip op., 1998 WL 544431 (D.N.H. August, 11, 1998). The *Mulligan* court also certified a class of plaintiffs asserting violations of RESPA, and rejected defendant's arguments that individual issues necessarily predominate over common issues. The court declared:

> The fatal flaw in [defendant's] argument is that it fails to address plaintiffs' claim that [defendant] violated RESPA because it failed to provide *any* legitimate goods and services in exchange for the [yield spread premiums] it received. If this assertion can be proved at trial through evidence common to the entire class, it will not be necessary to conduct a case-by-case inquiry of the reasonableness of any particular [yield spread premium] as the trier of fact will already have determined that [defendant] failed to render any compensable goods or services in exchange for the [yield spread premiums] it received.

*Id.* at 15. Defendant's arguments suffer the same fatal flaw.

Residential also makes the blanket assertion that "[c]lass certification is not appropriate for cases alleging a violation of RESPA." Indeed, several courts have refused to certify classes in RESPA cases. *See, e.g., Marinaccio v. Barnett Banks, Inc.*, 176 F.R.D. 104 (S.D.N.Y.1997); *Moniz v. Crossland Mortgage Corp.*, 175 F.R.D. 1 (D.Mass.1997).[8] However, these decisions are based on the HUD test concerning the reasonableness of the overall fee. This Court agrees with the

---

7. It is important to note that borrowers who obtained "no cost" loans are excluded from the proposed class. In a "no cost" loan, the broker's only compensation is paid by the lender; the borrower does not pay an origination fee or any other compensation to the broker. Because mortgage brokers do not work for free, it is clear that at least a portion of the fee paid by the lender is compensation for the broker's services in no cost loan transactions. Thus, the only issue is whether the total fee is reasonable. If borrowers who secured no cost loans were included in the class, there would be individual issues as to the reasonableness of the fee in each no cost loan transaction. However, the proposed class includes only borrowers who paid an origination and/or broker fee, and accordingly excludes borrowers who obtained no cost loans.

8. The Court has considered the decision in *Schmitz v. Aegis Mortgage Corp.*, Civil No. 97–3142, slip op. (D.Minn. August 3, 1998). The procedural posture in *Schmitz* makes it distinguishable. Indeed the Court in *Schmitz* distinguished *Culpepper* because it involved summary judgment motions, as is true in this case.

*Culpepper* court that RESPA first requires an inquiry into whether the yield spread premium represents payment for services. *See Culpepper,* 132 F.3d at 697. Common issues of fact and law predominate on the issue of whether the yield spread premium represented a payment for services in the first instance.[9]

### 2. Superiority

██ The final requirement for certification under Rule 23(b)(3) addresses whether the class action mechanism is superior to other methods of resolution. Fed.R.Civ.P. 23(b)(3). Having determined that common issues of fact and law predominate, the superiority requirement is easily satisfied—a class action will prevent duplicative litigation, it will provide a uniform result for similarly situated parties, and it will allow class members to pursue claims that might otherwise be cost prohibitive. The Court accordingly holds that a class action is superior to other methods of resolving plaintiffs' claims.

In conclusion, plaintiffs have demonstrated that this case is suitable for class-wide resolution under Rule 23(b)(3). The Court therefore grants plaintiffs' motion and provisionally certifies a class for liability purposes. As with any class certification, however, this decision is "inherently tentative" and subject to further developments in the case. *See Falcon,* 457 U.S. at 160, 102 S.Ct. 2364.

### ORDER

Based on the foregoing, and on all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Mercantile's motion for summary judgment [Docket No. 62] is **GRANTED in part** and **DENIED in part.** Mercantile's motion is granted as to Counts III and IV of the Complaint, and those counts are **DISMISSED** with prejudice.

2. Residential's motion for summary judgment [Docket No. 51] is **DENIED.**

3. Plaintiffs' motion for summary judgment [Docket No. 70] is **DENIED.**

4. Plaintiffs' motion for class certification [Docket No. 88] is **GRANTED.** The Court certifies this matter as a class action on behalf of those persons who:

A. Entered into a residential mortgage transaction that was documented as a transaction under RESPA, in that a HUD–1 Settlement Statement was provided;

B. Paid Residential a loan origination and/or broker fee;

C. The loan was originated in the name of Residential, but funded by Mercantile and assigned to Mercantile within two weeks of closing; and

D. The HUD–1 Settlement Statement shows that a "yield spread premium," "yield spread differential," "par-plus premium," "service release premium," or the like was paid to Residential.

5. Class members are to be notified of the maintenance of this lawsuit pursuant to Fed.R.Civ.P. 23(c)(2). Plaintiffs shall submit a proposed notice to the Court within fifteen (15) days of the date of this Order, preferably together with a stipulation from Residential and Mercantile on the content of the notice. If there is no stipulation, each defendant shall file a memorandum explaining its objections to the proposed notice within seven days after the proposed notice is filed. If necessary, defendants may submit an alternative proposed notice along with their memoranda.

---

**9.** There are, of course, individual questions on the issue of damages. However, the Court can resolve individual damage claims, if necessary, after liability is determined.