Thomas A. SCHMITZ, on behalf of himself and all others similarly situated, Plaintiff,

v.

AEGIS MORTGAGE CORPORATION, an Oklahoma corporation, formerly known as EMC Financial, Inc., and Home Town Mortgage, Inc., Defendants.

Civil No. 97–2142 (DSD/JMM).

United States District Court, D. Minnesota.

April 23, 1999.

Eric Wesley Valen, Valen Law Office, St. Paul, MN, William Harvey Crowder, Susan Clair Bedor, Vildan A. Teske, Crowder & Bedor, St. Paul, MN, Daniel A. Edelman, Cathleen M. Combs, Ignacio D. Maramba, Edelman & Combs, Chicago, IL, for plaintiffs.

James A. O'Neal, Dara D. Mann, Faegre & Benson, Minneapolis, MN, Laurence E. Platt, R. Bruce Allensworth, Irene C. Freidel, Kirkpatrick & Lockhart, Boston, MA, for defendant Aegis Motgage Corp.

Jeffrey R. Ansel, Winthrop & Weinstine, St. Paul, MN, for defendant Home Town Mortgage, Inc.

## ORDER

DOTY, District Judge.

This matter is before the court on the cross-motions of the parties for summary

judgment. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court grants defendants' motions and denies plaintiff's motion.

## BACKGROUND

Plaintiff Thomas A. Schmitz ("Schmitz") hired defendant Home Town Mortgage, Inc. ("Home Town") to obtain financing for a residential home loan. Home Town is a Minnesota corporation and mortgage broker in the business of making or arranging for mortgage loans between consumer borrowers and wholesale lenders. On September 27, 1996, the plaintiff's loan was closed and plaintiff entered into a mortgage loan transaction with defendant Aegis Mortgage Corporation ("Aegis"), an Oklahoma corporation engaged in wholesale residential mortgage lending with national operations. Home Town arranged the transaction, in which Schmitz received a conventional, thirty-year mortgage loan with a five percent down payment at an interest rate of 8.25 percent.

At the loan closing, Schmitz signed a HUD–1 Settlement Statement that disclosed actual settlement costs and payments. In connection with the closing, Schmitz paid the following amounts to Home Mortgage: a loan origination fee of $1,681; a processing fee of $350; a document preparation fee of $35; an appraisal fee of $300; and a credit report fee of $50. The statement also shows that Aegis paid a yield spread premium to Home Town in the amount of $1,050.94, which was paid outside the closing. The loan transaction was "table funded" by Aegis, meaning that Aegis, rather than Home Town, provided the money to fund the loan.

On July 11, 1996, Aegis and Home Town entered into an Aegis Mortgage Corporation Broker Agreement, which defines the parties' relationship. Aegis also provides each of its brokers with a manual or broker guide that describes the various loan programs offered by Aegis and sets forth certain program requirements that a broker must meet for Aegis to purchase a loan.

Aegis sends Home Town daily rate sheets that show the types of loans Aegis will make to qualified borrowers. Aegis offers mortgage loans priced at "par," "above par," or "below par." Par is a benchmark rate. Par is the lowest interest rate at which Aegis will make a loan without charging the borrower or broker "discount points." When the mortgage broker brings Aegis a loan at an "above par" rate, meaning that the interest rate of the loan is higher than par, Aegis pays the broker a yield spread premium. In the case of the Schmitz loan, the yield spread premium paid by Aegis to Home Town was calculated based on the size of the loan, the interest rate that the loan carried, the time at which the loan closed, and the type of loan selected by Schmitz.

In the present action, Schmitz contends that the yield spread premium paid by Aegis to Town Home is an illegal payment under section 8 of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607 ("RESPA"). Schmitz also brings state law claims. On August 4, 1998, the court issued an order denying defendants motion for class certification.[1] The parties now bring cross-motions for summary judgment.

### A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affi-

1. On April 13, 1999, the court received a letter from Schmitz's counsel requesting permission to file a motion for reconsideration regarding the court's August 4, 1998 order. The court will deny this request. As defendants point out in their response letter, both

the HUD Policy Statement, discussed below, and Judge Rosenbaum's decision denying class certification in *Yasgur v. Aegis Mortgage Corp.*, Civ. No. 98–121 (JMR/FLN) (D.Minn. March 10, 1999), confirm that the court's decision was correct.

davits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 252, 106 S.Ct. 2505.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *See id.* at 250, 106 S.Ct. 2505. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *See id.* at 322–23, 106 S.Ct. 2548.

**B. RESPA Claims**

▮▮▮▮ Schmitz's primary contention is that Aegis's payment of a yield spread premium to Home Town violated section 8 of RESPA.[2] As the court stated in its prior order denying class certification, to determine whether a yield spread premium is an illegal payment under RESPA, the factfinder must determine whether any goods or services were actually provided and, if so, whether the payment was reasonably charged. *See Schmitz v. Aegis Mortgage Corp.,* Civ. No. 97–2142 (DSD/JMM) (D.Minn. Aug. 4, 1998). On March 1, 1999, the U.S. Department of Housing and Urban Development ("HUD") issued a policy statement specifically addressing the issue of mortgage broker compensation, including yield spread premiums, in the context of RESPA. *See* Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers ("Policy Statement"), 64 Fed.Reg. 10080 (1999).[3] The Policy Statement clarifies at least three important issues regarding the legality of yield spread premiums. First, it underscores the fact that yield spread premiums are not illegal per se: "In transactions where lenders make payments to mortgage brokers, HUD does not consider such payments (i.e., yield spread premiums or any other class of named payments) to be illegal per se. HUD does not view the name of the payment as the appropriate issue under RESPA." 64 Fed.Reg. at 10084.[4] Second, the Policy Statement confirms that factfinders must engage in a two-part analysis when evalu-

---

**2.** Schmitz brings two claims under RESPA, alleging that the yield spread premium paid to Home Town amounted to (1) a kickback or referral, in violation of section 8(a) of RESPA, 12 U.S.C. § 2607(a), and (2) a split fee, in violation of section 8(b) of RESPA, 12 U.S.C. § 2607(a). Both claims are subject to the reasonableness test set forth in the new HUD Policy Statement and discussed below.

**3.** As the parties correctly point out, HUD's interpretation of RESPA is entitled to substantial deference. *See Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 739–42, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**4.** In addition, the Policy Statement specifically recognizes the validity of yield spread premiums as calculated by defendants in the present case: "In determining the price of a loan, mortgage brokers rely on rate quotes issued by lenders, sometimes several times a day. When a lender agrees to purchase a loan from a broker, the broker receives that then applicable pricing for the loan based on the difference between the rate reflected in the rate quote and the rate of the loan entered into by the borrower." 64 Fed.Reg. at 10081.

ating the legality of lender payments to brokers:

> In determining whether a payment from a lender to a mortgage broker is permissible under Section 8 of RESPA, the first question is whether goods or facilities were actually furnished or services were actually performed for the compensation paid. The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker does not by itself make the payment legal. The second question is whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed.

*Id.* Third, the HUD Policy Statement emphasizes that yield spread premiums are not subject to special scrutiny under the foregoing framework. Rather, a yield spread premium is but one form of potential compensation that must be considered when evaluating the overall reasonableness of a mortgage transaction:

> In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to goods, facilities, or services furnished or performed to determine whether it is legal under RESPA. Total compensation to a broker includes direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all.

*Id.*

This last point is especially significant in light of *Culpepper v. Inland Mortgage Corp.,* 132 F.3d 692 (11th Cir.1998), the only circuit court decision to date that has addressed the issue of yield spread premiums in the context of RESPA. In *Culpepper,* the Eleventh Circuit reversed a grant of summary judgment by the trial court, holding that the defendant lender had failed to establish that the yield spread premium it paid to a broker was in exchange for goods or services:

> [I]t is undisputed that the payment of the yield spread premium was not tied to the quantity or quality of the services that [the broker] provided. Rather the sole determinant of whether a yield spread premium would be paid was the interest rate on the loan.

*Id.* at 697. Because the lender had failed to show that the yield spread premium was linked to a specific good or service, the *Culpepper* court determined that the reasonableness prong of the standard RESPA test was inapplicable. *See id.* On petition for rehearing, the Eleventh Circuit clarified that yield spread premiums were not illegal per se and that the legality of such a premium is "highly dependent on the facts" of each case. *Culpepper v. Inland Mortgage Corp.,* 144 F.3d 717, 718 (11th Cir.1998). However, the court stated once again that, in a RESPA action, the defendant lender must "tie the yield spread premium to services provided" by the broker. *Id.* Thus, *Culpepper* appears to place a substantial evidentiary burden on the RESPA defendant who has utilized a yield spread premium in connection with a mortgage transaction: the defendant must affirmatively show that the premium was compensation for a particular good or service before it can argue that the broker's compensation for the mortgage transaction was reasonable.

Because yield spread premiums are, by definition, tied to financial aspects of the loan rather than some specific broker good or service, RESPA defendants who have utilized yield spread premiums will ordinarily find it difficult to meet the initial burden articulated in *Culpepper.* Indeed, the *Culpepper* approach is the precisely the reason that several courts have decided to certify RESPA classes in cases involving yield spread premiums. *See, e.g., Dujanovic v. MortgageAmerica, Inc.,* 185 F.R.D. 660 (N.D.Ala. March 25, 1999) ("Here plaintiff seeks to prove that [defendant's] standard practice is to pay a yield

spread premium for above-par loans and to tie the amount of the premium not to the quantity or quality of any services supplied by the broker, but solely to the amount of difference between the par and above-par rates. Such generalized evidence could convince a factfinder that there is simply no factual connection between the payment of the yield spread premium and any goods or services whatsoever."); *Brancheau v. Residential Mortgage*, 182 F.R.D. 579, 586 (D.Minn.1998) ("Before assessing the reasonableness of the fee, the Court must determine that the yield spread premium represents a payment for either goods or services. Defendant[s'] arguments [that total compensation is reasonable] become relevant only if the finder of fact concludes that the yield spread premium represented bona fide compensation for service.").

However, the new HUD Policy Statement imposes no such stringent evidentiary burden on the RESPA defendant. Under the Policy Statement, the threshold question is simply whether the mortgage broker has provided legitimate goods or services in connection with the loan transaction. Once this showing is made, the question then becomes whether the quantum of goods, facilities, and services provided is reasonably related to the "total compensation" received by the broker. As the Policy Statement unequivocally states: "All payments, including payments based upon a percentage of the loan amount [i.e., yield spread premiums], are subject to the reasonableness test defined above." 64 Fed.Reg. at 10086. While the Policy Statement observes that "higher interest rates alone cannot justify higher total fees to mortgage brokers," it emphasizes that all fees, including "seemingly duplicative fees," should "be scrutinized as part of total compensation to determine that total compensation is reasonably related to the

goods or services actually performed." *Id.* at 10086.[5] Thus, a functional reasonableness analysis, rather than the rigid approach suggested in *Culpepper,* is the "determinative test under RESPA." *Id.* at 10085.

■ With these considerations in mind, the court concludes that Schmitz has failed to show that the Home Town's total compensation was unreasonable in relation to the goods, facilities, and services actually provided. First, there is no genuine factual dispute that Home Town provided compensable goods, facilities, and services in originating Schmitz's loan. The Policy Statement provides the following non-exhaustive list of valid loan origination services:

(a) Taking information from the borrower and filling out the application;

(b) Analyzing the prospective borrower's income and debt and pre-qualifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford;

(c) Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;

(d) Collecting financial information (tax returns, bank statements) and other related documents that are part of the application process;

(e) Initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit);

(f) Initiating/ordering requests for mortgage and other loan verifications;

(g) Initiating/ordering appraisals;

(h) Initiating/ordering inspections or engineering reports;

---

**5.** The Policy Statement provides this illustration: "For example, if the lender pays the mortgage broker $600 and the borrower pays the mortgage broker $500, the total compensation of $1,100 would be examined to determine whether it is reasonably related to the goods or facilities actually furnished or services actually performed by the broker." *Id.* at 10086.

(i) Providing disclosures (truth in lending, good faith estimate, others) to the borrower;

(j) Assisting the borrower in understanding and clearing credit problems;

(k) Maintaining regular contact with the borrower, realtors, lender, between the application and closing to appraise them of the status of the application and closing to appraise them of the status of the application and gather any additional information as needed;

(*l*) Ordering legal documents;

(m) Determining whether the property was located in a flood zone or ordering such a service;

(n) Participating in the loan closing.

*Id.* at 10085. Here, the record evidence shows that Home Town provided exactly these kind of services to Schmitz during the loan origination process. As Del Peterson, Vice President of Home Town, states in his affidavit, Home Town performed the following in connection with the Schmitz loan: (1) prepared the loan application; (2) analyzed Schmitz's income and debt and pre-qualified him for a loan; (3) counseled Schmitz about the different types of loan products available; (4) counseled Schmitz when he reapplied for a conventional loan based on the home sellers' unwillingness to allow Schmitz to use a VA guaranteed loan; (5) verified employment and deposits; (6) arranged for mortgage and other loan verifications; (7) arranged property appraisals; (8) provided disclosures; (9) obtained credit reports; (10) maintained regular contact with Schmitz and Aegis throughout the loan process; (11) arranged for the preparation of legal documents; (12) arranged for the loan closing. *See* Peterson Aff.2d at ¶ 5, 22–38 (Jan. 22, 1999); *see also* Goetz Dep. at 49–59. Further, there is no dispute that Home Town provided certain "goods" and "facilities" as defined by the Policy Statement. 64 Fed.Reg. at 10085 (identifying compensable "goods," such as "appraisals, credit reports, and other documents required for a complete loan file," and compensable "facilities," such as "a reasonable portion of the broker's retail or 'storefront' operation").[6]

■ Second, there is no genuine factual dispute that the compensation received by Home Town in connection with its work on the Schmitz loan was reasonable. The Policy Statement suggests that, when evaluating the reasonableness of broker compensation, the factfinder consider "fees paid in relation to price structures and practices in similar transactions and in similar markets." *Id.* at 10086. Defendants have provided precisely this kind of analysis, in the form of Del Peterson's affidavit statement:

> The yield [spread premium] plus the other compensation and fees ... constitute all of the compensation received by Home Town in connection with this mortgage loan transaction. The total net compensation received by Home Town from Mr. Schmitz and Aegis was $3,140.44. This total net compensation was reasonably related to the market value of the services we provided in the geographic area where Home Town does business for the type, number and level

**6.** On the issue of what constitutes a "good" under RESPA, the Policy Statement resolves another uncertainty in the caselaw: "[T]he loan itself, which is arranged by the mortgage broker, cannot be regarded as a 'good' that the broker may sell to the lender and that the lender may pay for based upon the loan's yield's relation to market value." 64 Fed. Reg. at 10085. Schmitz contends· that this aspect of the Policy Statement mandates summary judgment in his favor because of defendants' memoranda assertions that a mortgage is a good which justifies payment in the form of a yield spread premium. However, an examination of the record reveals that the "mortgage loan as good" argument has never been more than a fall-back position for the defendants. They have primarily asserted that the yield spread premium was part of·the total bundle of compensation Home Town received for actual services rendered. And, as stated, the Policy Statement wholly supports this line of argument.

of particular services that Home Town provided in arranging the loan. . . .

Peterson Aff. at ¶ 41. On the other side, Schmitz has offered no evidence whatsoever that Home Town's compensation was unreasonable in relation to prevailing price structures at the time of the loan transaction. In fact, Schmitz acknowledges that Home Town did a satisfactory job in obtaining his home loan and admits that he does not know if Home Town's total compensation for its work was reasonable or not. *See* Schmitz Depo. at 46, 54, 58, 60–61, 78, 86, 104–05, 110–12, 127–29, 140–46.

In sum, Schmitz has failed to demonstrate a genuine issue of fact as to either (1) Home Town's actual provision of valuable services or (2) the reasonableness of Home Town's compensation for those services. Accordingly, the court must grant defendants' motions for summary judgment on Schmitz's RESPA claims.

## C. Inducement to Breach Fiduciary Duty

■ Schmitz also contends that Aegis induced Home Town to breach a fiduciary obligation. For purposes of analysis, the court will assume that this claim is cognizable under Minnesota law. To prevail on an inducement of breach of fiduciary duty claim, Schmitz must show that: (1) Home Town breached a fiduciary duty; (2) Aegis induced or participated in the breach; and (3) damages resulted. *Brancheau*, 182 F.R.D. at 588 (citing *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847–48 (2d Cir. 1987)). However, Schmitz has failed to establish this prima facie case. First, he has not presented any evidence that Home Town breached a fiduciary duty. As discussed above, Home Town performed a great deal of work, at a reasonable cost, in successfully securing a loan with terms that were acceptable to Schmitz. And Schmitz has affirmatively testified that Home Town met every expectation he possessed with regard to its work on securing a loan for him. *See* Schmitz Depo. at 121–22. Further, Schmitz has failed to demonstrate that he suffered harm as a result of obtaining the Aegis loan. In *Brancheau*, the court addressed precisely this point:

Plaintiffs contend they might have gotten a loan at a lower interest rate without the inducement of a yield spread premium. However, plaintiffs would have had to pay more at closing in exchange for a lower rate. Plaintiffs have not shown that the economic terms of a loan transaction without a yield spread premium would have been more advantageous than the actual loan transaction.

*Id.* The reasoning of *Brancheau* here applies with equal force to the facts of the present case. Therefore, defendants are entitled to summary judgment on Schmitz's claim for inducing a breach of fiduciary duty.

## D. Intentional Interference with Contractual Relations

■ Finally, Schmitz brings a claim for intentional interference with contractual relations. To prevail on this claim, Schmitz must show that: (1) he has entered into a contract with Home Town; (2) Aegis knew of the contract; (3) Aegis intentionally interfered with the contract; (4) such interference was not justified; (5) Schmitz suffered damages as a result. *See Midwest Great Dane Trailers, Inc. v. Great Dane Limited Partnership*, 977 F.Supp. 1386, 1395 (D.Minn.1997). Schmitz, however, has failed to sufficiently establish any of these elements. First, Schmitz does not clearly articulate what contract undergirds his claim or what the terms of that contract might be. He merely states that "a contract existed between Mr. Schmitz and Home Town as evidenced by the Application and Lock–In Agreement." Schmitz S.J. Memo. at 19. Second, Schmitz has not shown that Aegis knew of any alleged contract between Schmitz and Home Town. Third, there is no evidence that Aegis did anything that interfered with Schmitz's ability to obtain a loan from Home Town. Indeed, if the lock-in agreement is viewed as the contract

at issue, Schmitz received exactly what he contracted for: a home loan funded at an interest rate of 8.25 percent. Accordingly, the court must grant summary judgment in favor of defendants on this claim.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' motions for summary judgment are granted.

2. Plaintiff's motion for summary judgment is denied.

3. Plaintiff's letter request for reconsideration of court's August 4, 1998 order is denied.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**