Mark **LEVINE**, Plaintiff,

v.

**NORTH AMERICAN MORTGAGE, a Dime Company; and FSI Mortgage, Inc., Defendants.**

No. Civ. 98–556(JRT/RLE).

United States District Court, D. Minnesota.

July 1, 1999.

Barry G. Reed, Hart L. Robinovitch, Zimmerman Reed, Minneapolis, MN, for plaintiff.

James A. O'Neal, Faegre & Benson, Minneapolis, MN, R. Bruce Allensworth, Irene C. Freidel, Kirkpatrick & Lockhart, Boston, MA, for defendants.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTIONS FOR CLASS CERTIFICATION AND SUMMARY JUDGMENT

TUNHEIM, District Judge.

Plaintiff Mark Levine commenced this putative class action against defendants North American Mortgage Company, A Dime Company ("Dime")[1] and FSI Mortgage, Inc. ("FSI") alleging violations of the anti-kickback and duplicative payment provisions of Section 8 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607. Specifically, plaintiff alleges that Dime, a wholesale mortgage lender, paid FSI, a retail mortgage broker, unlawful compensation in the form of a "yield spread premium" for referring plaintiff's loan to Dime.

This matter is before the Court on plaintiff's motion for class certification of its claims against Dime and motion for summary judgment. Plaintiff seeks to certify a class of all persons residing in the United States who from six years from the date this action was filed:

1. North American Mortgage Company and Dime Mortgage, Inc. ("Dime"), merged in October 1997.

1. Obtained a federally related home loan;

2. Where the loan was registered or referred to ... Dime by a broker;

3. Where the broker and [Dime] were in an ongoing relationship to refer settlement business under Dime's standard "Mortgage Brokerage Agreement";

4. Where a yield spread premium, service release premium, premium pricing, par plus premium, yield differential, lender paid broker fee, or the like however denominated, was paid to the class members' mortgage broker by [Dime];

5. Where the borrower paid to the broker a loan origination fee, broker fee, or other compensation for the settlement services provided by the broker;

6. Where [Dime] owned the loan, including the servicing rights at closing by funding or table funding the loan.

Plaintiff also moves for class-wide summary judgment based on the language of Dime's Mortgage Brokerage Agreement, which he contends violates RESPA on its face. For the reasons set forth below, plaintiff's motions are denied.

## BACKGROUND

In July 1997, plaintiff sought to finance the purchase of his Minneapolis, Minnesota residence. He hired FSI to serve as his mortgage broker to help him obtain a mortgage loan. Plaintiff agreed to pay a fee to FSI for its services in the amount of one percent of the loan amount.[2] The parties appear to dispute whether plaintiff and FSI discussed the possibility that FSI might receive a fee or other compensation in addition to the one percent origination fee.

Prior to closing, FSI referred the loan to Dime for possible funding. Dime is a wholesale residential mortgage lender which conducts business throughout the United States with hundreds of mortgage brokers. It provides capital for broker-originated mortgage loans, acquires loans, and then often will resell such loans while retaining servicing rights. It has business relationships with approximately 3,000 mortgage brokers across the country. Dime admits that it does not necessarily offer the lowest interest rates and most favorable terms on any given day.

After plaintiff discussed possible monthly payments with FSI, FSI committed to obtain a thirty-year, fixed-rate mortgage for him, funded by Dime. · The fixed interest rate was 7.625%. Prior to the closing, Dime underwrote and approved the loan.

At the August 28, 1997 closing, plaintiff, who is an attorney, represented himself. He was presented with a United States Department of Housing and Urban Development Settlement Statement ("HUD–1 Statement") which disclosed the origination fee plaintiff paid to FSI. It also disclosed a payment of a $592.50 yield spread premium fee from Dime to FSI.[3] The HUD–1 Statement contained no definition or explanation of "yield spread premium." Dime notes, however, that plaintiff never asked about the yield spread premium fee at the closing.

The yield spread premium was .75% of the total loan amount, calculated according to Dime's daily rate sheet. The amount of the yield spread premium Dime offered to FSI increased proportionally as the interest rate of the loan rose above its "par rate." The "par rate" is the base interest rate at which a lender will make a particular type of loan to a qualified borrower on a given date. It is the lowest rate at which Dime will make loans without charging the borrower discount points. For loans with interest rates at an "above par rate," Dime will pay a yield spread premium based on its daily rate sheet.

The agreement between Dime and FSI is contained in Dime's standard Mortgage Brokerage Agreement ("the Agreement"). It appears undisputed that the Agreement governed the relationship between Dime and

---

2. Plaintiff sought a loan of $79,000. The fee he agreed to pay FSI therefore was $790.

3. Specifically, on line 809, it read "YIELD SPREAD PREMIUM FROM DIME TO FSI MORTGAGE, INC. 592.50 P.O.C." The dollar figure appears in the space in which the particular ·settlement charge is defined; the "P.O.C." appears in the column entitled "Paid From Borrower's Funds at Settlement."

thousands of brokers during the relevant period and that Dime had no other contract with these brokers addressing the funding of loans or the payment of yield spread premiums. Indeed, section 8.3 of the Agreement provides that it "contains the entire agreement between the parties and supersedes all prior agreements, arrangements, and understandings relating to the subject matter thereof."

Although the Agreement references services, nowhere does it expressly indicate that the yield spread premium payment is in exchange for goods, facilities, or services. Plaintiff points to several portions of the Agreement that he contends establish conclusively that the yield spread premium Dime paid to its brokers is in exchange for the loan referral, or, in other words, is a referral fee. Dime disagrees, referencing various provisions which it believes suggest that the yield spread premium payments may be payments for services rendered by FSI. The relevant provisions of the Agreement the parties reference are as follows:

> WHEREAS, Mortgage Broker is in the business of originating residential mortgage loans (each a "Mortgage Loan") for delivery to mortgage lenders.

> WHEREAS, Dime is a mortgage lender that accepts conventional, FHA and VA Mortgage Loan origination's [sic] (servicing released) from licensed mortgage brokers and enters into Table-funding arrangements with licensed originators;

> NOW, THEREFORE, in consideration of the mutual covenants made herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

> \*　　\*　　\*　　\*　　\*　　\*

> Section 2.1 *Origination, Purchase and Sale of Mortgage Loans.*

> (a) From time to time, Mortgage Broker may refer residential mortgage loan applications to Dime and/or offer to originate Mortgage Loans for Dime under a Table-funding arrangement. Each such mortgage application and Mortgage Loan shall conform to the terms, conditions, represen-

tations, warranties and covenants contained in this Agreement and the Broker Manual. Nothing in this Agreement shall obligate Dime to accept the referral of any such application or to purchase any such Mortgage Loan.

> \*　　\*　　\*　　\*　　\*　　\*

> (e) Mortgage Broker shall provide the following services, as applicable, to the loan applicant(s) for applications that it intends to refer to Dime:

> (i) advise the loan applicant(s) of the mortgage loan products that are available and the eligibility requirements for such loan products; (ii) based on information supplied by the applicant(s), counsel the applicant(s) on the amount of debt and the types of mortgage loan products for which the applicant(s) may qualify; (iii) identify potential problems that may impair the eligibility of the applicant(s) for mortgage financing, based upon Dime's lending guidelines; (iv) assist the applicant(s) in completing all necessary forms, including the loan application; (v) review the accuracy and completeness of the information provided by the applicant(s); (vi) collect financial information such as tax returns, W–2's [sic] and bank statements, and order required reports, including, but not limited to, a credit report on the applicant(s), a property appraisal, a verification of employment and a verification of deposit; (vii) provide applicable lending disclosures; (viii) assist applicant(s) in understanding and clearing credit problems; (ix) submit the loan package of the applicant(s) to Dime; (x) keep applicant(s) informed as to status of the loan application; (xi) coordinate the acceptance of any approval or loan commitment by the Dime, and counsel the applicant(s) as to the satisfaction of any outstanding conditions set forth in any such approval or loan commitment; (xii) from time to time, upon request of Dime, serve as its liaison with the applicant(s) for subsequent correspondence and communication; and (xiii) assist in coordinating the closing between applicant(s) and Dime.

> \*　　\*　　\*　　\*　　\*　　\*

> Section 2.2 *Payment of Broker Fee: Table–Funding*

(a) Dime's wholesale pricing is described in its daily Rate Sheets, which Dime provides to Mortgage Broker and that set forth the available interest rate and point combinations on loan products offered by Dime. Mortgage Broker covenants and agrees that i) its compensation shall not exceed the value of the services it has actually performed; ii) shall not accept any fee or compensation except as permitted by applicable law and regulation; and (iii) it has disclosed any fees it will receive in connection with the Mortgage Loan to the loan applicant(s) as required by applicable law and regulations.

(b) Dime shall fund each Table-funded Mortgage Loan at settlement so that Mortgage Broker shall not be required to use its own funds.

\*   \*   \*   \*   \*   \*

### ARTICLE IV

### SPECIFIC REPRESENTATIONS AND WARRANTIES OF MORTGAGE BROKER AS TO THE MORTGAGE LOANS

As further inducement to Dime to enter into this Agreement and to consummate the purchases of Mortgage Loans hereunder. . . .

\*   \*   \*   \*   \*   \*

Section 5.1 *Delivery of Documents.* With respect to Table-funded Mortgage Loans, Mortgage Broker agrees to, at its sole cost and expense, perform all acts necessary to perfect title to the Mortgage Loans in Dime, and shall sell, assign and deliver to Dime as part of the Mortgage File with respect to the purchase of each such Mortgage Loan, the documents listed in Broker Manual, all subject to the approval of Dime and its legal counsel as to proper form and execution.[4]

Dime's rate sheets set forth the applicable par rates on a given day and the yield spread premiums corresponding to various above par rates. Dime provides these sheets to brokers, but the sheets specifically inform the brokers that the information therein is intended for brokers only. FSI does not provide various lenders' rate sheets to borrowers and, at least initially, will not offer borrowers information regarding a lender's par rate.

Plaintiff contends, based on the language of the Agreement, that the yield spread premium was Dime's means of purchasing loans, or in other words, persuading brokers to send prospective loans to Dime for funding rather than to its competitors and to do so at the highest possible rate. He also points to the rate sheets, the deposition testimony of the FSI broker that handled plaintiff's loan, and the testimony of a Dime employee to support this contention.[5] Based on this evidence, according to plaintiff, Dime's yield spread premium is a classic referral fee.

Dime responds that the Agreement's language does not support plaintiff's claim. It also argues, contrary to plaintiff's claims, that it does not benefit from above-par loans nor does it have a need for such loans. Indeed, according to Dime, above-par loans are not necessarily more profitable because they pre-pay sooner than loans at par or below par.[6]

Also, Dime argues that yield spread premium fees subsidize compensation paid to the mortgage broker for services provided by the broker. The yield spread premium provides the borrower with the opportunity to reduce direct costs through compensation by the lender in exchange for an above-par rate. For example, brokers can offer borrowers

---

4. The Agreement defines "Table-funding" as "the practice where the Mortgage Loan is closed in the Mortgage Broker's name and assigned on the Closing Date to Dime, which funds the Mortgage Loan."

5. In his deposition, the broker responded "yes" when asked whether he had sold servicing rights to Dime on plaintiff's loan. The Dime employee suggested in his deposition that the yield spread premiums were paid to brokers to increase potential loan business.

6. Dime also discusses in some detail why the payment of the yield spread premium by a mortgage lender to a broker for an above-par loan is the product of a market valuation of the mortgage loan asset.

"no points" or "low closing cost" loans because they receive some or all of their compensation from the lender in the form of the yield spread premium fee. Thus, in Dime's view, the yield spread premium is simply an alternative or supplemental mechanism for paying for transaction costs and services associated with originating, processing, and closing the mortgage loan.

According to FSI, it did not place plaintiff's loan with Dime as opposed to another lender because Dime offered to pay FSI a yield spread premium. FSI contends it placed the loan with Dime because of Dime's customer service and common-sense underwriting. Also, according to FSI, it used both the origination fee and the premium fee to cover the costs it incurred in originating the loan. The total compensation FSI received for originating the Levine loan was $1,232.50—the origination fee plus the yield spread premium fee minus the $150 commitment fee that FSI paid Dime on plaintiff's behalf. Defendants claim that this total compensation was reasonably related to the market value of the services FSI provided.[7]

Plaintiff filed his initial Complaint in this action on January 29, 1998. He subsequently filed an Amended Complaint.

## DISCUSSION

### I. ANALYTICAL FRAMEWORK FOR DETERMINING WHETHER A YIELD SPREAD PREMIUM OR SIMILAR PAYMENT VIOLATES RESPA

Congress enacted RESPA to protect home buyers from "unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. § 2601(a). Among other things, Congress intended to eliminate "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement ser-

vices." § 2601(b)(2). The statute applies to all federally related mortgage loans. *See* 24 C.F.R. § 3500.5(a).

RESPA contains two prohibitions at issue in this matter. Section 2607(a) prohibits providers of settlement services from paying referral fees and kickbacks:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

Section 2607(b) prohibits the splitting of settlement services or charging of duplicative fees:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

However, § 2607(c) exempts from these prohibitions payments for goods or services, stating in pertinent part:

> Nothing in this section shall be construed as prohibiting ... the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed....

The parties do not appear to dispute that if the yield spread premiums Dime pays to its brokers pursuant to its Mortgage Broker Agreement do not fall within the exemption set forth in subsection (c) of § 2607, they are prohibited fees under subsections (a) and (b).[8] Moreover, Dime does not claim that the yield spread premium it pays to its brokers is compensation for some good or facili-

---

7. The FSI broker that handled plaintiff's transaction submitted an affidavit setting forth the numerous services he provided in originating and processing the loan. At least some of these services coincide with the services listed in Section 2.1(e) of the Mortgage Broker Agreement.

8. Dime argues that the yield spread premiums it payed to brokers pursuant to the Mortgage Broker Agreement were not referral fees prohibited under subsections (a) and (b). Yet this conten-

tion ultimately is premised on Dime's assertion that it paid yield spread premiums to the brokers as compensation for various services the broker would provide in originating and processing the loan. Accordingly, if these payments are found not to be compensation for services (exempted under subsection (c)), Dime offers no plausible argument why they would not constitute illegal fees under subsections (a) and (b).

ty furnished.[9] Thus, boiled down, Dime's defense is limited to its contention that the yield spread premium payments it made during the relevant period were part of the total compensation its brokers received for services actually performed in originating and processing the loans. Congress did not explain how to determine when a payment or fee—in the form of a yield spread premium or otherwise—from a lender to a broker constitutes services actually performed.

In *Brancheau v. Residential Mortgage and Mercantile Bank*, 182 F.R.D. 579, 584–85 (D.Minn.1998), this Court addressed the analytical steps for determining whether a yield spread premium falls within the subsection (c) exemption. In that case, as here, the plaintiff contended that a yield spread premium paid by a lender to a mortgage broker constituted an illegal referral fee or unearned fee under subsections (a) and (b).[10] Relying on the regulatory guidance available at the time and on *Culpepper v. Inland Mortgage Corp.*, 132 F.3d 692, 696–97 (11th Cir.), *as modified*, 144 F.3d 717 (1998), the only circuit court decision to have addressed the issue, the Court concluded that the analysis under subsection (c) involves two steps. *See Brancheau*, 182 F.R.D. at 584–85. Under the first step, the fact finder must determine whether the payment was made in exchange for, or was tied to services actually performed. *See id.* at 584; *see also Culpepper*, 132 F.3d at 696–97 (stating that a yield spread premium violates RESPA if it is not tied to or provided in exchange for services). If not, the payment violates RESPA's prohibition against kickbacks and referral fees. *See Brancheau*, 182 F.R.D. at 585; *Culpepper*, 132 F.3d at 697 (indicating that where a premium is not tied to the services performed, it constitutes an illegal referral fee,

regardless of whether the fee was reasonable). If so, the fact finder must move to the second step and assess whether the payment is so excessive that a portion of the payment should be considered an improper referral fee. Under this step, "a fee that bears 'no reasonable relationship to the market value of the ... services provided' is not considered compensation for ... services." *Brancheau*, 182 F.R.D. at 584 (quoting 24 C.F.R. § 3500.14(g)(2)). If the payment fails under this inquiry, it likewise violates RESPA. *See id.* If the payment satisfies both steps, it is protected under subsection (c). *See id.* at 584–85.

■ Yield spread premiums are not *per se* illegal under this analytical framework. *See, e.g., Culpepper*, 144 F.3d at 718 (clarifying that yield spread premiums are not *per se* illegal). However, as the *Culpepper* court recognized, the first step poses a significant hurdle for defendant lenders and brokers who paid or received yield spread premiums: demonstrating that such a payment was tied to or made in exchange for services actually performed is difficult since the premium depends solely on the interest rate of the loan, not the quality or quantity of services performed. *See id.* at 718–19.

The Court believes that the analysis it adopted in *Brancheau* —which undeniably places an onerous burden on lenders and brokers who paid or received a yield spread premium in connection with a loan transaction—is consistent with the language and purposes of RESPA. Nevertheless, HUD subsequently issued a policy statement which articulates an alternative, equally plausible test for determining the validity of yield spread premiums (and other lender payments to brokers) under subsection (c). *See*

---

9. Although plaintiff anticipated that Dime would argue that a loan or the servicing rights to a loan constitutes a "good," under subsection (c), Dime does not appear to offer such a theory. If Dime were to make such an argument, the Court would reject it for the reasons articulated in its decision in *Brancheau v. Residential Mortgage and Mercantile Bank*, 182 F.R.D. 579, 585 (D.Minn.1998).

10. Also, like the plaintiff in this case, the *Brancheau* plaintiff sought to certify a class of borrowers who had paid their mortgage broker an

origination fee, but whose broker also had received a yield spread premium from the lender that funded the loan. *See* 182 F.R.D. at 588. The proposed class in this case is substantially broader than the one proposed in *Brancheau*, however, because the class plaintiff proposes encompasses loans originated through numerous brokers that worked with Dime, while the class in *Brancheau* included only borrowers who had acquired loans through a single broker working with the lender. *See id.*

Real Estate Settlement Procedures Act Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers ("Policy Statement" or "the Statement"), 64 Fed.Reg. 10080 (1999).[11]

The Policy Statement's initial articulation of its two-part analysis is as follows:

> In determining whether a payment from a lender to a mortgage broker is permissible under Section 8 of RESPA, the first question is whether goods or facilities were actually furnished or services were actually performed for the compensation paid. The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker does not by itself make the payment legal. The second question is whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed.

*Id.* at 10084. While not a model of clarity, the first step in the Statement's analysis addresses simply whether any goods or services were actually furnished or performed, rather than, as under analysis suggested in *Culpepper,* whether the goods or services the broker provided can be tied directly to the payment. This interpretation is confirmed by the Statement's later description of the inquiry:

> In the determination of whether payments from lenders to mortgage brokers are permissible under Section 8 of RESPA, the

threshold question is *whether there were goods or facilities actually furnished or services actually performed for the total compensation paid to the mortgage broker.* In making the determination of whether compensable services *are performed,* HUD's letter to the Independent Bankers Association of America, dated February 14, 1995 (IBAA letter) may be useful. In that letter, HUD identified the following services normally performed in the origination of a loan. . . .

\*　　\*　　\*　　\*　　\*　　\*

> In examining services provided by mortgage brokers and payments to mortgage brokers, HUD will look at the types of origination services listed in the IBAA letter to help determine whether compensable services *are performed.*

*Id.* at 10085 (emphasis added).[12] Likewise, in its transition into discussing the second step of the analysis, HUD again indicated that the initial inquiry merely involves a determination of whether goods were furnished or services were performed:

> *The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker,* as described in the IBAA letter, does not by itself make a payment by a lender to a mortgage broker legal. The next inquiry is whether the payment is reasonably related to the value of the goods or facilities that were actually fur-

---

**11.** Congress authorized HUD to prescribe rules and regulations to interpret and apply RESPA as may be necessary to achieve the statute's purpose. *See* 12 U.S.C. § 2617(a); 12 U.S.C. 2602(6). Previously, HUD had promulgated Regulation X, a set of rules interpreting RESPA, codified at 24 C.F.R. §§ 3500 *et seq.* Regulation X addresses the statute's prohibition against kickbacks and unearned fees in 24 C.F.R. § 3500.14. This provision repeats § 2607's prohibition against compensation for the referral of settlement service business and subsection (c)'s exemption for bona fide compensation for services actually performed. *See* 24 C.F.R. § 3500.14(c) and (g)(1). It also states in relevant part:

> If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided. These facts may be used as evidence of a violation of section 8 and may serve

as a basis for a RESPA investigation. High prices standing alone are not proof of a RESPA violation. The value of a referral (i.e., the value of any additional business obtained thereby) is not to be taken into account in determining whether the payment exceeds the reasonable value of such goods, facilities or services.

24 C.F.R. § 3500.14(g)(2). Nowhere, however, does Regulation X explain how this "market value" analysis fits in the overall analysis for determining whether a payment—such as a yield spread premium—that otherwise would constitute an illegal referral or unearned fee under § 2607(a) and (b), fits within the subsection (c) exemption.

**12.** The Policy Statement then lists a series of broker services that, if performed, may entitle the broker to compensation. *See id.*

nished or services that were actually performed.

*Id.* at 10085–86 (emphasis added).

Thus, according to the Policy Statement, a fact finder's first task in determining the legality of a yield spread premium under Section 8 of RESPA is whether the broker actually furnished goods or facilities or performed services. If the broker did furnish goods or perform services, the second inquiry is whether the "total compensation" to the broker—including direct fees paid by the borrower and the yield spread premium—is reasonably related to the goods or services furnished or performed. *See id.* at 10084; *see also id.* at 10087 (stating "total compensation" to a broker "direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all").[13]

Based primarily on the Policy Statement's guidance, another judge in this District—the Honorable David S. Doty—recently rejected the more rigorous approach *Culpepper* suggests. *See Schmitz v. Aegis Mortgage Corp.*, 48 F.Supp.2d 877, 881–82 (D.Minn.1999).[14] After applying the test the Statement sets forth, and finding no genuine dispute of material fact that the total compensation paid to the broker in that case was reasonable in light of the services it provided, Judge Doty granted summary judgment in favor of defendant and denied plaintiff's motion for summary judgment and request for reconsideration. *See id.* at 881–84.

■ Plaintiff argues vigorously that the analysis and holding in *Schmitz* must be rejected because it ignores the reality in that case and here that the respective lenders purchased loans from the brokers with their yield spread premiums. Based on the Policy Statement language set forth above, the Court rejects plaintiff's contention that

*Schmitz* misinterpreted HUD's directive. In addition, this Court agrees with Judge Doty that HUD's interpretation of RESPA is entitled to substantial deference. *See id.* at 880 n. 3; *see also Smiley v. Citibank (South Dakota)*, 517 U.S. 735, 739–42, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus, in order for plaintiff's attack to succeed, he must show that HUD's interpretation of RESPA and application of the statute to yield spread premiums is irrational, arbitrary, or manifestly contrary to the language of the statute. *See, e.g., Chevron, U.S.A.*, 467 U.S. at 843–44, 104 S.Ct. 2778 (holding that where Congress has delegated authority to an agency to elucidate a provision of a statute, the agency's rules and regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) (stating that an agency's interpretation of a statute is entitled to substantial deference unless it can be shown to be irrational).

■ The Court finds that plaintiff has failed to meet this heavy burden. While the Policy Statement's first step is less rigorous than that suggested in *Culpepper* and previously applied by this Court in *Brancheau*, it is consistent with the purpose and language of RESPA. By simply ensuring that the broker's total compensation is reasonably related to the goods or services the broker actually furnishes, the Policy Statement serves RESPA's primary goal of preventing kickbacks or referral fees that unnecessarily and unreasonably increase the costs of settlement services. *See* § 2607(a) and (b). Also, Congress did not include in RESPA a specific methodology for distinguishing between unlawful referral fees and unearned fees and

---

13. The Court notes, however, that the Policy Statement confirms this Court's conclusion in *Brancheau* that the loan itself—or the right to service the loan—is not a "good." *See* 64 Fed. Reg. at 10085 ("[W]hile a broker may be compensated for goods or facilities actually furnished or services actually performed, the loan itself, which is arranged by the mortgage broker, cannot be regarded as a 'good' that the broker may

sell to the lender and that the lender may pay for based upon the loan's yield's relation to market value, reasonable or otherwise.").

14. Judge Doty issued *Schmitz* after oral argument in this matter. Defendants notified this Court of the decision by letter, and plaintiff submitted a letter criticizing Judge Doty's analysis.

legitimate payments for goods and services. The Policy Statement's "total compensation for goods and services" approach is a reasonable method of distinguishing between lender payments to brokers that fall within the protections of subsection (c) and those that do not.[15] Thus, HUD reasonably determined that a yield spread premium is an unlawful referral fee or unearned fee under subsections (a) and (b) only if the broker provided no goods or performed no services or the total compensation the broker received eclipses the bounds of subsection (c) by exceeding the reasonable value of the goods provided or services performed.[16]

■ Thus, the Court is obliged to adopt the test HUD articulated in the Policy Statement and rejects the more rigorous *Culpepper* approach it previously applied in *Brancheau*.[17] The Court notes, however, that this holding should not be construed as suggesting that yield spread premiums are presumptively valid. Despite mortgage industry claims to the contrary, because yield spread premiums are calculated based solely on the interest rate of the loan and offer a financial incentive to brokers unrelated to the quantity or quality of services provided, they are worthy of close scrutiny. Indeed, while the Policy Statement confirms that yield spread premiums are not *per se* illegal under RESPA, it warns that "higher interest rates alone cannot justify higher total fees to mortgage brokers." 64 Fed.Reg. at 10086. Many

lenders and brokers may have a difficulty showing that a broker's total compensation is reasonable, particularly where, for example, a borrower can demonstrate that his broker provided the same set services for other borrowers while receiving a significantly lower yield spread premium or no premium at all. *Cf. id.* at 10084 ("HUD believes that total compensation should be carefully considered in relation to price structures and practices in similar transactions and in similar markets."). The Court merely holds that HUD's analysis—rather than that suggested in *Culpepper*—now governs the inquiry.

## II. PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), plaintiff moves for certification of the aforementioned class of borrowers who received loans Dime funded through a mortgage broker pursuant to its standard Mortgage Brokerage Agreement. The Court may certify this class only if, after a rigorous analysis, it determines that plaintiff has proven that his claims satisfy each of the requirements of Rule 23(a) and one of the requirements of Rule 23(b). *See, e.g., General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *see also Coleman v. Watt,* 40 F.3d 255, 258 (8th Cir.1994) (stating that plaintiffs have the burden of establishing they have satisfied

15. Again, the Court believes *Culpepper's* approach—which requires a direct link between the payment and the goods and services and a reasonable relationship between the payment and the value of the goods and services—also is consistent with the statutory language. However, between two reasonable interpretations, HUD, in its discretion, has chosen the one that does not follow *Culpepper.*

16. Under HUD's analysis, the lender's "intent" or "motive" in offering the yield spread premium to brokers (to "buy loans" or otherwise) and the broker's intent or motive in entering into an agreement with the lender appear to be irrelevant; as long as the broker performs services or provides goods and the total compensation for those services or goods is reasonable, the fee is valid under subsection (c). Similarly, because HUD recognized that "indirect fees" based only on the interest rate of the loan are legal if they form part of reasonable, total compensation to the broker for services performed, it implicitly

rejected any requirement that the lender demonstrate that a yield spread premium was given as "consideration" for such services. *See id.* at 10087 (stating "total compensation" to a broker includes "direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all"). As long as the broker's total compensation is reasonable, the yield spread premium will not offend RESPA, regardless of whether the lender and broker viewed the goods or services as "consideration" for the yield spread premium. The Court is bound to follow HUD's lead on these matters, whether or not it would reach the same conclusions on its own.

17. For this reason, in a separate opinion issued today, the Court grants the *Brancheau* defendants' motion for reconsideration and vacates portions of its previous Memorandum and Order in that case.

each of Rule 23's class certification requirements); *Jenson v. Eveleth Taconite Co.,* 139 F.R.D. 657, 659 (D.Minn.1991) (same).

Under Rule 23(a), the proposed class must satisfy the requirements of 1) numerosity, 2) commonality, 3) typicality, and 4) adequacy of representation. Under Rule 23(b)(3), the only portion of Rule 23(b) on which plaintiff relies,[18] plaintiff must show that questions of law or fact common to the members of the class predominated over any questions affecting only individual members and that a class action is superior to other available methods for resolving the members' claims. In a Rule 23(b)(3) case, Rule 23(a)'s commonality requirement obviously is intertwined with the more stringent requirement that questions common to the class predominate over individual questions.

■ The Court may refer to allegations in the Amended Complaint in deciding whether the requirements of Rule 23 are met. However, when necessary, the Court also may go beyond the Amended Complaint and look at the evidence to examine the factual and legal issues. *See, e.g., General Tel. Co. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Castano v. American Tobacco Co.,* 84 F.3d 734, 744–45 (5th Cir.1996).

Dime does not dispute that the proposed class would satisfy the numerosity prong of Rule 23(a). Also, while Dime does not concede that plaintiff can satisfy the requirements of typicality and adequate representation, the clear thrust of its argument is that plaintiff cannot demonstrate that questions common to the class predominate over individual questions. Because the Court finds that common questions do not predominate, it need not address these other prerequisites for certification.

■ The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689 (1997). This standard is met "when there exists generalized evidence that

proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 693 (D.Minn.1995); *see In re Workers' Compensation,* 130 F.R.D. 99, 108 (D.Minn.1990) (quoting *In re Indus. Gas,* 100 F.R.D. 280, 288 (N.D.Ill.1983)) (same).

Plaintiff contends that this matter can be resolved using generalized evidence. In particular, plaintiff points to the Mortgage Broker Agreement, which governed the relationships between . Dime and the brokers to whom it paid yield spread premiums during the relevant period. Plaintiff claims this agreement is void of any provision that indicates that the yield spread premium was a payment for services. Plaintiff also notes that Dime's rate sheets provide for the payment of yield spread premiums based solely on the par rate applicable on a given day, not on individual circumstances. In addition, he points to the broker's alleged admission at his deposition that FSI sold the servicing rights to plaintiff's loan to Dime in exchange for the yield spread premium and to the testimony of a Dime employee regarding the purpose of the yield spread premium.

■ However, this evidence is insufficient alone to establish an element of a claim under § 2607. First, the Court disagrees with plaintiff that the terms of the Mortgage Broker Agreement plainly establish that the yield spread premiums Dime paid to the brokers constitute prohibited referral fees. Although the Agreement acknowledges that the broker may refer loans to Dime, it contains no provision that states the yield spread premium is a referral fee. Likewise, it contains no provision that precludes the possibility that the yield spread premium would compensate the broker for services rendered. On the contrary, Section 2.1(e) expressly provides that the broker will perform a number of services. Furthermore, while Section 5.1 states that the broker shall perform certain acts and services at its sole cost and expense, it in no way suggests that the yield spread

---

**18.** Although plaintiff's motion for class certification requests that the Court certify a class under Rule 23(b)(2), he provides no argument in his memoranda in support of this class. Thus, the Court will only consider the portion of his motion relying upon Rule 23(b)(3).

premium is not compensation for these or other services; in other words, simply because Dime refuses to pay additional sums for certain acts and services does not mean that the yield spread premium was not partial compensation for these or other services. The language of the Agreement therefore does not rule out, as a matter of law, that the yield spread premium is compensation for services.

■ Moreover, and more importantly, under the two-part test set forth in the Policy Statement, the terms of the Agreement are not dispositive. Under the first step of the analysis suggested in *Culpepper*, the terms of an agreement between a lender and a broker might be decisive, because the terms may demonstrate conclusively that the lender did not provide the yield spread premium directly *in exchange for* services the broker provided. Indeed, in *Brancheau*, this Court found that the predominance inquiry was satisfied precisely because *Culpepper's* first step could be resolved using only generalized evidence.[19] *See* 182 F.R.D. at 590–91. Under the newly clarified HUD analysis, however, neither step of the inquiry depends on a finding whether the yield spread premium was tied specifically to, or paid in exchange for services provided. Rather, as discussed

above, the first step focuses on whether the broker provided any services, and the second step focuses on whether the total compensation for these services was reasonable. A fact finder cannot make either determination by referring only to the Agreement.[20] For the same reasons, the rate sheet and deposition testimony are insufficient alone to resolve either step of the analysis.

■ Although the Court does not rule out the possibility that some RESPA claims may be suitable for class-wide treatment even under HUD's analysis, plaintiff has not demonstrated that the claim in this case is appropriate for certification. Plaintiff has not shown that the issue of whether a broker (who received a yield spread premium from Dime) failed to provide services is subject to generalized proof. Similarly, the inquiry into the reasonableness of the total compensation for services depends on the particular facts of each loan transaction. Again, while members of the proposed class may be able to demonstrate that Dime violated RESPA under HUD's "total compensation" approach, plaintiff has provided no explanation for how such claims can be prosecuted except by utilizing individualized evidence. For this reason, plaintiff's motion for class certification is denied.[21]

19. The Court expressly recognized in *Brancheau* that several courts had refused to certify classes in RESPA cases. Nevertheless, prior to HUD's issuance of its Policy Statement, the Court viewed *Culpepper* as the most persuasive authority available and found that the first step in the *Culpepper* analysis is suitable for class-wide resolution under Rule 23(b)(3). The Court still believes that if *Culpepper's* analysis were applicable, class treatment of its first step would be appropriate. Indeed, on remand, the district court in *Culpepper*, certified the class in that case. *See Culpepper v. Inland Mortgage Corp.*, File No. V 96–BU–0917–S (N.D.Ala. June 22, 1999). *But see Drootman v. First Nat'l Bank*, No. 97–252 PHX TSZ, slip op. at 7 (D.Az. Feb. 17, 1999) (stating that *Culpepper's* focus on the particular facts of the transaction before it cuts against class certification). However, as set forth above, the Court now recognizes that it must apply the analysis the Policy Statement outlines. Because the Policy Statement's two steps are not suitable for class-wide determination, at least in the circumstances presented in *Brancheau*, the Court vacates its certification of the class in that case in a separate opinion issued today.

20. The Court also rejects plaintiff's suggestion that Dime's "compensation for services" argument should be disregarded because it is merely a hindsight justification. Plaintiff contends that the Court should focus instead on what, in his view, really happened here, namely, that Dime was purchasing loans (and servicing rights) from its brokers. Again, the Agreement does not clearly indicate that the yield spread premium was paid as compensation for something other than services. In any event, even if the lender and broker viewed the yield spread premium as a fee for referring servicing rights, their intent is not decisive under HUD's analysis. The fact finder must determine, regardless of the contracting parties' intent, whether the broker's total compensation was reasonable.

21. The Court is cognizant of the fact that, given the relatively small amount of money at issue in an individual claim involving a yield spread premium, individual RESPA actions may not be economically feasible in many circumstances. This reality no doubt will chill borrowers' enforcement of their rights under RESPA. Partly for this reason, the class action would be the superior means of addressing RESPA violations,

## III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff also moves for summary judgment on an individual and class-wide basis. Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment, stating in pertinent part:

[Summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To the extent plaintiff moves for summary judgment on a class-wide basis, his motion is denied as moot, because the Court has denied his motion for certification. To the extent he moves for summary judgment on an individual basis, his motion is denied because genuine disputes of material fact preclude judgment as a matter of law in his favor.

Plaintiff's sole argument in support of summary judgment is that the language of the Mortgage Broker Agreement unambiguously establishes that Dime did not pay yield spread premiums to brokers for their services, but rather as a fee for referring loan business. For the reasons set forth in the previous section, the Court rejects plaintiff's contention that the language of the Agreement establishes as a matter of law that Dime paid the premiums exclusively for the referral of business. In addition, the terms of the Agreement are not independently determinative under the two-part HUD analysis: a fact finder must inquire whether FSI provided services and whether the total compensation it received for those services was reasonable. Plaintiff has not demonstrated nor has he even argued that the record establishes beyond dispute that FSI did not provide services in originating and processing his loan or that FSI's total compensation for such services was unreasonable. Thus, summary judgment in favor of plaintiff would be inappropriate.

### ORDER

Based on the foregoing, and all of the records, files, and proceedings herein, **IT IS HEREBY ORDERED:**

1. Plaintiff's motion for class certification [Docket Nos. 27 and 44] is **DENIED.**

2. Plaintiff's motion for summary judgment [Docket No. 28] is **DENIED.**

---

if the other prerequisites for certification were satisfied. Nevertheless, because plaintiff has failed to demonstrate that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, certification is inappropriate in this case. If Congress believes that borrowers cannot protect themselves effectively from mortgage industry abuses under HUD's current interpretation of the law, it should modify RESPA to provide greater protection.