[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 99-13725

_____

D. C. Docket No. 96-00917-CV-H-S

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 15, 2001
THOMAS K. KAHN
CLERK

JOHN ROBERT CULPEPPER, PATRICIA
STARNES CULPEPPER, on behalf of
themselves and all others similarly situated,

Plaintiffs-Appellees,

versus

IRWIN MORTGAGE CORPORATION,
f.k.a. Inland Mortgage Corporation,

Defendant-Appellant.

* * * * * * * * * * * * * * * * * * *

D. C. Docket No. 98-CV-2187

BEATRICE N. HIERS, individually and as
a representative of a class of similarly situated persons,

Plaintiff-Appellee,

versus

IRWIN MORTGAGE CORPORATION,
f.k.a. Inland Mortgage Corporation,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(June 15, 2001)

Before EDMONDSON, COX and GIBSON [*], Circuit Judges.

COX, Circuit Judge:

This action under § 8 of the Real Estate Settlement Practices Act[1] is now on

its second visit to our court.  The plaintiffs, who have home mortgage loans from

Irwin Mortgage Corporation, claim that certain payments, called "yield spread

---

[*]        Honorable John R. Gibson, U. S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1]        12 U.S.C. § 2607.

2

premiums," that Irwin made to the mortgage brokers who handled the plaintiffs' loan applications are illegal kickbacks or referral fees under § 8. The district court initially granted Irwin summary judgment, and on the action's first trip to this court, we reversed. *Culpepper v. Inland Mortgage Corp. (Culpepper I)*, 132 F.3d 692, 694 (11th Cir. 1998).[2] (The court then explained in a published order denying rehearing (*Culpepper II*) that its opinion — which merely reversed summary judgment — should of course not be read to require summary judgment in the *plaintiffs'* favor.[3]) The panel remanded for further proceedings.

One of those proceedings was a motion for class certification, which the district court granted. The plaintiff class now comprises

> [a]ll persons who, from April 11, 1995, until this class is certified, [June 22, 1999], inclusive, obtained an FHA mortgage loan that was funded by Irwin Mortgage Corporation wherein the broker was paid a loan origination fee of 1% or more and wherein Irwin paid a "yield spread premium" to a mortgage broker.[4]

---

[2]    Inland Mortgage Corporation has become Irwin Mortgage Corporation since the first appeal.

[3]    Culpepper v. Inland Mortgage Corp. (Culpepper II), 144 F.3d 717, 717-18 (11th Cir. 1998).

[4]    (R.1-59 at 2.)

Irwin was permitted to appeal this class certification under Fed. R. Civ. P. 23(f).

Reviewing the district court's ruling for abuse of discretion only,[5] we affirm.

*Background*

The "yield spread premiums" at issue in this case,[6] as the panel explained

more fully in *Culpepper I*,[7] are payments from Irwin to its mortgage brokers that the

written agreement between them contemplates, but does not define.[8]  Each business

day, Irwin distributes a rate sheet to its brokers, listing the terms of the loans Irwin is

offering that day.  The loans' interest rates are set with reference to a "par rate." If

the broker originates a loan at a below-par rate, it gets no compensation from Irwin.

On the other hand, originating a loan at an above-par rate garners the broker a yield

spread premium, whose amount is determined by a formula that includes the amount

of the loan and the difference between the loan rate and the par rate.  The formula

does not take into account the amount of work the broker actually performed in

---

[5]     Heaven v. Trust Co. Bank, 118 F.3d 735, 737 (11th Cir. 1997).

[6]     We do not pretend to define, or address in this opinion, all of the payments that lenders and brokers may refer to as "yield spread premiums."

[7]     *See Culpepper I*, 132 F.3d at 694.

[8]     The form "Revised Loan Broker Agreement" between Irwin and both the brokers involved in this case makes only one explicit mention of yield spread premiums, in a section setting the price for repurchase of a loan by the broker back from Irwin.  That price, the agreement provides, includes "[a]ny yield spread premium . . . or other amounts previously paid by Irwin to Broker for the Loan."  (1st Supp. R.-Pls.' Evid. Submiss. Supp. Mot. Class. Cert. Ex. D. § 10.)

originating the loan or how much the borrower paid in fees for the broker's services. *See Culpepper I*, 132 F.3d at 694.

Section 8(a) of the Real Estate Settlement Practices Act (RESPA) prohibits both the giving and acceptance of "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service . . . shall be referred to any person." 12 U.S.C. § 2607(a). (Lending is clearly a "business incident to or a part of a real estate settlement service." *See* 12 U.S.C. § 2602(3).) Subsection (c) then qualifies subsection (a)'s blanket prohibition by explicitly sheltering from liability "the payment of a fee . . . by a lender to its duly appointed agent for services actually performed in the making of a loan." *Id.* § 2607(c)(1)(C). The Senate report accompanying RESPA explains that subsection (c) is there to "specifically set[] forth the types of legitimate payments that would not be proscribed by the section." S. Rep. No. 93-866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546, 6552.

Presented with this § 8 challenge to yield spread premiums, the *Culpepper I* panel read § 8(a) to prescribe a three-part test for prohibited payments. A payment is prohibited if "(1) a payment of a thing of value is (2) made pursuant to an agreement to refer settlement business and (3) a referral actually occurs." *Culpepper*

*I*, 132 F.3d at 696. The undisputed facts in this action are that Irwin offered to pay (and did pay) a yield spread premium to the broker here, under their agreement, which led the broker to choose Irwin. Those facts satisfy § 8(a), the panel concluded. That § 8(a) conclusion remains unchallenged on this appeal.

The court went on to reject Irwin's argument that yield spread premiums are nonetheless sheltered by § 8(c). Irwin's payments to brokers, the court concluded, resist characterization as payment for services.[9] Nothing in their agreement, for instance, suggests that the amount paid is in any way dependent on the services provided; most significantly, nothing in the record suggests that the broker renders less service in originating a below-par loan than it does for an above-par loan, or that Irwin ever inquires into how much work the broker actually did. Rather, the payment rests solely on the value of the referral. Yield spread premiums, the panel concluded, are thus prohibited referral fees — or at least a jury could so find. *Id.* at 696-97; *Culpepper II*, 144 F.3d at 718.

Following this court's opinion in *Culpepper I*, Congress issued a conference report demanding that HUD "clarify" its position concerning the legality of yield

---

[9] Irwin devotes a surprising amount of its brief to challenging this conclusion about the merits. The question of whether Irwin's yield spread premiums are, or could be, § 8 kickbacks is not relevant to this appeal, which is about the propriety of class certification.

spread premiums. HUD responded with a policy statement, which 24 C.F.R. § 3500.4(a)(1)(ii) imbues with the force of a regulation,[10] that yield spread premiums are not illegal per se, but can nonetheless be illegal. HUD tests their legality in two steps. The first question — whose interpretation is the crux of this appeal — is "whether goods or facilities were actually furnished or services were actually performed for the compensation paid." Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10080, 10084 (Dep't of Hous. & Urban Dev. March 1, 1999)[hereinafter HUD Statement]. The fact that "services have been actually performed by the mortgage broker does not by itself," HUD explains, "make the payment legal." *Id.* Rather, an answer of "yes" to the first question leads to the second question, which is "whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed." *Id.* The remainder of the Statement describes in some detail the application of this rule. The Statement is ambiguous, however, as to the core of the

_____

[10] The Secretary of Housing and Urban Development has power under 12 U.S.C. § 2617 to issue interpretive regulations, and has done so. *See* 24 C.F.R. pt. 3500. None of those regulations add anything to the statute that is pertinent to the issues presented in this case.

class-certification dispute here, permitting the parties to read it in importantly different ways, as we next explain.

*Contentions of the Parties*

The parties agree that deciding whether class certification is appropriate — the ultimate issue in this appeal — requires us, in the end, to settle on a rule of liability under § 8(a) and (c). The reason is that Irwin attacks only the district court's conclusion that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that the class is thus certifiable under Fed. R. Civ. P. 23(b)(3). Irwin contends that evidence specific to each plaintiff's loan transaction will predominate at trial, making class treatment improper. Whether transaction-specific evidence is necessary or relevant, of course, depends on the rule of liability. *See* 2 Weinstein's Federal Evidence § 401.04[3][b] (Joseph M. McLaughlin ed., 2d ed. 1997). Hence we arrive at determining the rule of liability.

The centerpiece of Irwin's argument on this point is that the HUD Statement overrules *Culpepper I*'s interpretation of § 8(c). According to Irwin, the Statement provides a two-step "reasonableness test": (1) whether *any* services were performed by the broker, and (2) whether the yield spread premium and the fees the borrower

pays the broker add up to reasonable compensation for the broker's work. In essence, Irwin says that any payment it makes to any potential referrer is all right, as long as the payment, whatever its reason, would have been reasonable compensation for services, had it been compensation for services.[11]  *Culpepper I*, Irwin argues, thus wrongly demands evidence that Irwin pays brokers yield spread premiums in return for service and not merely to reward brokers for high-interest loan referrals. HUD's rule, Irwin continues, demands that legality be tested transaction by transaction, since the amount of work done by the broker (investigation, paperwork, counseling, and so forth) varies from loan to loan.

As a fallback position, Irwin argues that even *Culpepper I*'s test for legality under § 8(c) — which asks whether the lender and the broker exchanged money for services, not just whether the broker's compensation was reasonable — requires us to determine whether the borrower and the broker subjectively intended, in each loan transaction, for the yield spread premium to be Irwin's payment for the broker's

---

[11]  This is roughly how many of the district courts that have denied class certification in yield spread premium cases have described the rule.  *See, e.g.*, *Schmitz v. Aegis Mortgage Corp.*, 48 F. Supp. 2d 877, 882 (D. Minn. 1999); *Levine v. N. Am. Mortgage Co.*, 188 F.R.D. 320, 327 (D. Minn. 1999); *Taylor v. Flagstar Bank*, 181 F.R.D. 509, 521 (M.D. Ala. 1998).

services.[12] That question, Irwin says, can only be answered with testimony about each loan transaction from its parties.

The plaintiffs counter that *Culpepper I* and the HUD Statement are consistent. This is so, they say, because the first question in HUD's two-step analysis includes not just whether the broker really worked, but also whether Irwin paid the money specifically for those services and not for the loan referral. HUD's first question would thus be, in substance, no more than a re-articulation of *Culpepper I*'s reason for rejecting Irwin's argument that yield spread premiums, even if otherwise prohibited by § 8(a), are protected compensation for services under § 8(c). Whether we use the first question in the HUD test or adhere to *Culpepper I*'s reasoning, the plaintiffs say, the result is the same. And that result obviates Irwin's asserted need to probe the reasonableness of the total broker compensation in any individual transaction. Moreover, the plaintiffs add, it would be absurd to judge the nature of the payment on the basis of the broker and borrower's intent in a particular transaction, and thus Irwin's fallback argument is meritless. The plaintiffs conclude that there is accordingly no need to look at any individual transaction to determine liability, and that class certification is therefore appropriate.

---

[12] This view also has some district court support. *See Chandler v. Washtenaw Mortgage Co.*, No. 94-A-1418-N, ms. op. at 3 (M.D. Ala. July 29, 1998).

10

These arguments framing the debate, we turn to determining the rule of liability prescribed by the HUD Statement.

*Discussion*

We agree with the plaintiffs' view of the rule of liability. Reaching that conclusion requires us to answer two questions. The first is interpretation of the HUD Statement: What does "for compensation paid" mean when HUD asks us in the first step of its two-step test to determine "whether goods or facilities were actually furnished or services were actually performed for the compensation paid"? HUD Statement at 10084. On one hand, if "for compensation paid" means "in exchange for compensation paid," then the plaintiffs correctly assert that the inquiry in this step includes not only whether the broker performed services, but also whether the broker performed the services as part of a services-for-money exchange. On the other hand, if "for compensation paid" means nothing at all, or if the phrase means "in connection with the loan transaction," as one district court has read it,[13] then Irwin is right that all we need to know for the first step is whether the broker did any work on a particular transaction. (They would also be right that *Culpepper I*

---

[13]     Schmitz v. Aegis Mortgage Corp., 48 F. Supp. 2d 877, 882 (D. Minn. 1999).

is possibly no longer good law, and we would have to decide whether it would nonetheless be law of this case.)

The second question arises from Irwin's fallback argument: Does the borrower and broker's subjective intent determine whether Irwin's payment to the broker is part of a services-for-money exchange? This question turns more on interpretation of *Culpepper I* because the HUD Statement is silent.

*What does "for compensation paid" mean?*

Three reasons persuade us that the plaintiffs' construction of the HUD Statement, and their explanation of how it fits with *Culpepper I*, is superior to Irwin's.

*First*, Irwin's preferred construction of HUD's language simply does not fit the language, while the plaintiffs' proposed reading fits very well. To begin with, it would be anomalous to ignore "for compensation paid" as sloppy drafting on HUD's part. Rational agency regulations have the force of law, and it is a "cardinal principle of statutory construction that we must 'give effect, if possible, to every clause and word of a statute.'" *Williams v. Taylor*, 120 S. Ct. 1495, 1519 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39, 75 S. Ct. 513, 520 (1953)) (internal quotation omitted)). To give the phrase the meaning that Irwin

12

would assign to it, moreover, ("in connection with the loan transaction") is impossible with our, and possibly any ordinary, use of the English language. On the other hand, the plaintiffs' suggestion that "for compensation paid" means "in exchange for compensation paid" is semantically very plausible. *See* Webster's Third International Dictionary 886 (unabridged ed. 1981) (defining "for" to mean "in exchange as the equivalent of" or "in requital of").

*Second*, Irwin's reading of the Statement is not only inconsistent with the Statement itself; it also would make the Statement clash with § 8(c)'s language. Section 8(c) authorizes "the payment of a fee . . . by a lender . . . for services actually performed." 12 U.S.C. § 2607(c)(1)(C). As we pointed out in discussing the HUD Statement's own language, the preposition "for" connotes an exchange. The word "fee," moreover, implies a planned money-services exchange even more strongly than "compensation." *Compare* Black's Law Dictionary 629 (7th ed. 1999) ("fee" means "a charge for labor or services") *with id.* 277 ("compensation" means both "damages" and "[r]emuneration . . . in return for services rendered; esp., salary or wages"). The statute itself thus implies very strongly that only payments whose reason is compensation for services fall within § 8(c)'s safe harbor, and we hesitate

to read the HUD Statement to stray from the statute by imposing no such limit on legality.

*Third*, accepting Irwin's view would have the HUD Statement create an inconsistency between § 8(a)'s liability test and § 8(c)'s exclusion from liability. Everything about § 8(c) suggests that it is an interpretive gloss on § 8(a) rather than a list of exemptions bestowed upon otherwise illegal conduct. Section 8(c)'s language starts with "[n]othing in this section shall be construed as prohibiting," not with "notwithstanding § 8(a)" or any other plain exception language. 12 U.S.C. § 2607(c). The Senate report explains that § 8(c)'s purpose was to "set[] forth the types of legitimate payments that would not be proscribed" by § 8(a). S. Rep. No. 93-866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546, 6552. And HUD introduces its regulatory list of payments that are proper under § 8(c) with the phrase "Section 8 of RESPA permits," not some language of exception. 24 C.F.R. § 3500.14(g)(1). If § 8(c) is only a gloss on § 8(a), making clear what § 8(a) allows in certain contexts, we should avoid reading § 8(c) to bless conduct that § 8(a) plainly outlaws.

That is exactly what Irwin's reading of the HUD Statement would do. The crux of § 8(a)'s liability test, even when the suspected referral fee is dressed up as something else, is whether the payment is to compensate a referrer for referrals; the

14

answer to that question lies in the terms of the agreement between the referrer and the recipient of the referral. *See, e.g.*, 24 C.F.R. pt. 3500 app. B exs. 1, 2, 6 (noting explicitly in the examples that the parties are swapping value for referrals); *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1162 (7th Cir. 1997) (focusing on the reason for a rent payment — whether it was to secure referrals or for other reasons — in determining § 8(a) liability, without asking whether the total rent was reasonable); *Aiea Lani Corp. v. Haw. Escrow & Title, Inc.*, 647 P.2d 257, 262 (Haw. 1982) (asking only if the reason for a reduced title insurance premium was in exchange for referrals, not whether the premium was otherwise reasonable). Under § 8(a), a payment whose reason is to compensate for referrals is illegal, period. If Irwin has read the HUD Statement correctly, however, HUD has now decided that § 8(c) deems *some* such referral fees legal — that is, referral fees that are paid by lenders and that would be reasonable service fees, if that's what they were. The plaintiffs' reading of the HUD Statement, by contrast, keeps § 8(c) as a gloss on § 8(a): Paying referral fees may be prohibited (as § 8(a) provides), but paying service fees is not (as § 8(c) provides), unless of course the lender pays so much that we can legitimately suspect a disguised referral fee. We prefer this reading of the HUD Statement, which preserves the harmony of § 8(a) and 8(c).

15

The structure and language of the HUD Statement and of RESPA § 8 thus support the plaintiffs' proposed rule of liability far better than Irwin's. Irwin maintains nonetheless that accepting the plaintiffs' view runs afoul of HUD's remark that yield spread premiums are not "illegal *per se*." HUD Statement at 10084 (italics in original). We do not think so. Our speculation on the outcome of other cases is of course dicta, but there is no reason to think that under the HUD Statement and *Culpepper I* a yield spread premium could not pass muster if the agreement to pay it bore the hallmarks of a fee-for-service exchange — if, for instance, Irwin required brokers to present a bill showing the services rendered, and how much the broker had collected in fees from the borrower, or if Irwin followed the advice of the Senate report to "persons and companies that provide settlement services" that they "ensure that any payments they make . . . are not out of line with the reasonable value of the services received." S. Rep. No. 93-866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546, 6551. So our holding is consistent not only with this remark by HUD, but also with *Culpepper II*'s similar observation about its holding. *See* 144 F.3d at 718.

We accordingly hold that the first step in the test for liability under § 8 is not only whether the broker performed some of the services described in the HUD Statement, but also whether the yield spread premium is payment for those services

rather than for a referral. The core theory of the plaintiffs in this case is that Irwin's

yield spread premiums are referral fees, and that we therefore need not reach the

second step, which is whether the broker's total compensation was reasonable.[14]

Because the plaintiffs could thus prevail solely by showing that Irwin's yield spread

premiums are referral fees, and not service fees, class treatment under Fed. R. Civ. P.

23(b)(3) is appropriate unless that threshold question itself demands loan-by-loan

evidence. Which brings us to the defendants' fallback argument.

*How do we tell whether there is a services-for-money exchange?*

That argument, as we explained above, is that the nature of the yield spread

premium is a product of the subjective intent of the broker and borrower. That

intent, Irwin continues, must be ascertained loan-by-loan because each loan of

course has a different borrower. The plaintiffs counter that *Culpepper I*'s analysis

suggests that the standardized terms under which Irwin pays yield spread premiums

can by themselves prove that yield spread premiums are fees for referrals.

We agree with the plaintiffs that *Culpepper I* does not imply Irwin's proposed

rule, which (because of the element of a third party's subjective intent) would put

---

[14]       The plaintiffs do have a fallback position, which is reflected in the class definition
and which we need not discuss here, that FHA regulations applicable to FHA loans make any
compensation to the broker over 1% of the loan value per se unreasonable.

Irwin in the bizarre position of not knowing whether its conduct was illegal when it committed it. Irwin's best source for the rule in *Culpepper I* is a single remark: "No evidence suggests that [the fee paid by the Culpeppers to their broker, Premiere] was not intended by both Premiere and the Culpeppers to compensate Premiere fully for the work it did for the Culpeppers." 132 F.3d at 696. This sentence does not, read in context, necessarily imply that broker and borrower intent ultimately determines whether Irwin's payment of a yield spread premium is for services or referrals. *Culpepper I*'s holding is that the terms of the implicit yield-spread-premium deal between Irwin and its brokers permit a jury to find that the premiums are referral fees. The panel reviews those terms and concludes in effect that a jury could reasonably infer that Irwin is really buying referrals. After all, Irwin may not know what services it has received when it pays the premium, but it does know that it has gotten a referral. The remark on which Irwin relies is best read in this context as a record observation. The court is merely implying that on the present record, Irwin looks to be wrong that, because brokers rely on the premiums for compensation, Irwin is buying services. We prefer not to take this remark out of context and promote it into an element of liability.

We therefore adopt the sounder rule, the one that *Culpepper I*'s reasons for denying summary judgment plainly imply, that the terms and conditions under which a lender pays the broker a yield spread premium can determine whether the yield spread premium is compensation for referring loans rather than a bona fide fee for services. There is no suggestion from the evidence or the argument here that Irwin negotiates yield spread premiums loan-by-loan, rather than paying them according to terms and conditions common to all the loans. Nor does Irwin contend that it intends some yield spread premiums to pay for services and others to pay for referrals. Given the test for liability that we interpret the HUD Statement and *Culpepper I* to impose, in these circumstances the district court acted within its discretion in determining that common questions of law and fact predominate and that class certification is thus appropriate under Fed. R. Civ. P. 23(b)(3).[15]

## Conclusion

For the foregoing reasons, the district court's certification of the described class is affirmed.

---

[15] Irwin argues briefly that the plaintiff Beatrice Hiers is not an adequate class representative because, having paid less than 1% of her loan value as a broker fee, she is not a member of the presently defined class. The Culpeppers' adequacy is unchallenged, and this issue about Hiers does not therefore affect the outcome of the appeal. Because the district court's certification order does not address the question of Hiers's adequacy, we leave the question open for the district court to consider in the first instance.

AFFIRMED.

EDMONDSON, Circuit Judge, concurs in the judgment.